IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LISA RINDFLEISCH, TIFFANY MELENDEZ, MICHELLE GENTILE, LAURIE BAKER and CHRISTINA NELMES, on behalf of themselves and others similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>GENTIVA HEALTH SERVICES, INC.,<br><br>   Defendant. | CIVIL ACTION NO. 1:10-CV-03288-SCJ |

**PARTIES' BRIEF IN SUPPORT OF THEIR SECOND JOINT MOTION FOR DISCOVERY CONFERENCE**

TABLE OF CONTENTS

PAGE

I.  FACTUAL BACKGROUND AND DISPUTED DISCOVERY
    ISSUES.................................................................................................1

    A.  Scope of Opt-in Discovery.................................................................2

        1.  The Parties' Respective Opt-in Discovery Proposals ..............3

            a.  Plaintiffs' Opt-in Discovery Proposal ...........................3

            b.  Defendant's Opt-in Discovery Proposal........................3

        2.  The Parties' Arguments in Support of Their Respective
            Opt-in Discovery Proposals .....................................................5

            a.  Plaintiffs' Argument in Support of Their Opt-in
                Discovery Proposal.......................................................5

            b.  Defendant's Argument in Support of Its Opt-in
                Discovery Proposal.....................................................21

    B.  Gentiva's Written Discovery Requests and Subpoenas
        Pertaining to Credit Card Statements, Cash Receipts, and Tax
        Returns ...........................................................................................42

        1.  Plaintiffs' Argument in Opposition to Defendant's
            Request for Plaintiffs' Personal Financial Information..........44

        2.  Defendant's Support for Compelling Responses to
            Discovery Requests Pertaining to Credit Card
            Statements, Cash Receipts, and Tax Returns.........................51

TABLE OF CONTENTS
(CONTINUED)

PAGE

C.    Gentiva's Written Discovery Requests and Subpoenas
Pertaining to the School Records of Plaintiffs' Children .................59

1.    Plaintiffs' Argument in Opposition to the Subpoena for
Plaintiffs' Children's School Records ....................................63

2.    Defendant's Argument in Support of its Requests and
Subpoenas Pertaining to the School Records of Plaintiffs'
Children .................................................................................66

II.    CONCLUSION ........................................................................................72

Plaintiffs Lisa Rindfleisch, Tiffany Melendez, Michelle Gentile, Laurie Baker, and Christina Nelmes (collectively, "Plaintiffs") and Defendant Gentiva Health Services, Inc. ("Defendant" or "Gentiva"), by and through their respective counsel, and pursuant to the Federal Rules of Civil Procedure, the Local Rules of the Court, and the Court's Order (Dkt. No. 119) denying the parties' Joint Motion for Discovery Conference (Dkt. No. 112) and requesting that the parties submit a consolidated pleading that more specifically presents the basis for their Motion. The Parties jointly submit this Brief in Support of Their Second Joint Motion for Discovery Conference.   In support of their Second Motion for Discovery Conference, concurrently filed herewith, the parties hereby state as follows:

## I.      FACTUAL BACKGROUND AND DISPUTED DISCOVERY ISSUES

Plaintiffs seek overtime pay for themselves and other Gentiva employees based on the allegation that certain Gentiva clinicians, including registered nurses, physical therapists, and occupational therapists (collectively, "Clinicians") are improperly classified as exempt under the Fair Labor Standards Act ("FLSA") based on Gentiva's use of an improper Pay Per Visit ("PPV") compensation model. (Dkt. No. 1, p. 1.)  Plaintiffs further claim that Gentiva violated New York and North Carolina state law by allegedly failing to pay Clinicians in these states for all hours worked.  (*Id*.)  Gentiva denies all of these allegations.  Plaintiffs seek to bring the case on behalf of themselves and all other similarly situated Clinicians.

Gentiva denies that Clinicians are similarly situated.  On April 13, 2011, this Court granted Plaintiffs' Motion for Preliminary Certification as a Collective Action and Issuance of Notice under the FLSA.  (Dkt. No. 167.)  The potential class size is estimated by Gentiva to be between 10,000 and 15,000 Clinicians.

On November 10, 2010, the parties participated in a discovery conference regarding their Joint Preliminary Report and Discovery Plan pursuant to Federal Rule of Civil Procedure 26(f).  During this conference, the parties were unable to reach an agreement on several discovery issues.  Since then, Defendant has deposed all five of the named Plaintiffs, and the parties have exchanged extensive written discovery and documents.  However, the parties have reached an impasse with respect to the issues identified below.

## A.    Scope of Opt-in Discovery

The parties have failed to reach an agreement regarding the scope of discovery related to opt-in Plaintiffs.  Discovery commenced in this lawsuit immediately after the parties' Rule 26(f) conference, and Gentiva served written discovery on all five named Plaintiffs, including thirteen (13) opt-in Plaintiffs.  Currently, Plaintiffs oppose opt-in discovery until the parties have reached an agreement on the number and limitations relating to such discovery.  While the parties have made numerous attempts to reach an agreement on the terms, including, but not limited to, a percentage of the opt-in Plaintiffs with a cap on the

total amount of discovery permitted, the parties have been unsuccessful in reaching an agreement.[1]

1.   The Parties' Respective Opt-in Discovery Proposals

a.   Plaintiffs' Opt-in Discovery Proposal

Plaintiffs' opt-in discovery proposal for depositions is as follows: (1) one to two percent of opt-in Plaintiffs may be deposed, with a cap of 15 depositions (which, along with the ten (10) depositions agreed upon in the original discovery plan would permit Defendant to take a total of 25 depositions); (2) three hours on the record to depose each opt-in Plaintiff; (3) written discovery served on two to three percent of opt-in Plaintiffs but not to exceed 50 opt-in Plaintiffs; (4) written discovery to be served on a random selection of all opt-in Plaintiffs rather than those specifically selected by Defendant; and (5) interrogatories, document requests, and admissions to be limited to ten (10) for each opt-in Plaintiff.[2]

b.   Defendant's Opt-in Discovery Proposal

Defendant's proposal for depositions of opt-in Plaintiffs is as follows:  (1) in addition to the ten (10) depositions the parties agreed to, Defendant seeks the right to depose a minimum of 50 percent of all opt-in Plaintiffs or 50 opt-in Plaintiffs,

---

[1] *See* email correspondence to and from A. Spinola and F. Horne, dated Nov. 15, 2010 through Nov. 16, 2010, attached as Exhibit ("Ex.") A.

[2] *See* Nov. 18, 2010 email correspondence between A. Spinola and F. Horne, attached as Ex. B.

whichever is greater, with a cap of 100 depositions (if any opt-in Plaintiff fails to appear for their scheduled deposition, Defendant may move for an order pursuant to Rule 37(a)(3)(B) to compel appearance, and any Plaintiff who fails to comply with such an order risks the sanctions set out in Rule 37(b), and Defendant would substitute a new deponent for any opt-in who fails to appear); (2) six hours on the record to depose each opt-in Plaintiff on the condition that Plaintiffs agree to certain stipulations; (3) written discovery served on at least 50 of the opt-in Plaintiffs, up to a maximum of 100 opt-in Plaintiffs; (4) written discovery should not be based on a random selection of opt-in Plaintiffs (if any opt-in Plaintiff fails to serve responses to written discovery, Defendant may move for an order pursuant to Rule 37(a)(3)(B) to compel a response and subject to the sanctions set out in Rule 37(b) with the ability to substitute a new opt-in Plaintiff for any opt-in Plaintiff who fails to respond to written discovery); and (5) limiting interrogatories, document requests, and admissions to fifteen (15) for each opt-in Plaintiff.[3]

The parties engaged in a telephone conference on December 28, 2010, to further discuss the scope of opt-in discovery, but failed to reach an agreement. The parties determined that these issues could not be resolved without Court assistance.

---

[3] *See* Dec. 14, 2010 correspondence from A. Spinola to C. Webber and F. Horne, pp. 1-3, attached as Ex. C.

2.    The Parties' Arguments in Support of Their Respective Opt-in
Discovery Proposals

a.    Plaintiffs' Argument in Support of Their Opt-in
Discovery Proposal

In the spirit of efficiency and compromise, Plaintiffs have made proposals to Defendant in an effort to resolve the discovery matters in a mutually agreeable and reasonably affordable manner.  Plaintiffs propose, however, that discovery of opt-in Plaintiffs be conducted in a manner that is reasonable and cost-efficient.  For example, if just two percent (2%) of the estimated 10,000 putative class members (200 Clinicians) opt-in to this collective action, Defendant contends it should be entitled to take 100 depositions.  The cost and expense – exclusive of attorney fees -- to Plaintiffs alone, is estimated to be between $300,000 and $400,000.  Defendant's proposal should be rejected because it is cumulative, duplicative, burdensome, inefficient, and would essentially convert a collective action into 100 individual lawsuits.

Courts may limit discovery pursuant to Rule 30 Subsection (b)(2)(C), which provides in pertinent part:

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; … or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in

5

> controversy, the parties' resources, the importance of the issues at
> stake in the litigation, and the importance of the proposed discovery in
> resolving the issues.

*Id.*  In this putative collective action, discovery limitations set forth in the Manual

for Complex Litigation, Fourth, § 11.45, should be applied.[4]

One of the benefits of FLSA collective actions is the "efficient resolution" of

a matter.  *Pivonka v. Board of County Comm'rs of Johnson County,*  Case No. 04-

2598, 2005 WL 1799208, at *5 (D. Kan. July 27, 2005) (citing *Hoffman-LaRoche*

*Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)).

Courts have held that "[d]iscovery in a collective action should be pursued in the

most efficient way possible" as "the very nature of a collective action is to resolve

similar claims at once, rather than litigating similar claims proved by the same

evidence over an extended period of time."  *Morales-Arcadio v. Shannon Produce*

*Farms, Inc.*, No. CV605-062, 2006 WL 2578835, at *3 (S.D. Ga. Aug. 28, 2006)

---

[4]  In exercising its authority to limit depositions, the court should use the
information provided by the parties about the need for the proposed depositions,
the subject matter to be covered, and the available alternatives.  The extent to
which the judge considers each particular deposition, categories of depositions, or
only the deposition program as a whole will depend on the circumstances of the
litigation.  The judge may, for example, condition the taking of certain depositions,
such as those of putative class members, on prior court approval.  The judge's
involvement in the development of this phase of the discovery plan should be
sufficient to establish meaningful control over the time and resources to be
expended.  Aside from setting appropriate limits, the judge should also be
concerned with the time and place of the depositions, including proposed travel
and the recording methods.  Manual For Complex Litigation, § 11.45.

(denying defendant's motion to compel written discovery responses from opt-in plaintiffs in FLSA collective actions).

Courts are increasingly analogizing 216(b) collective actions to Rule 23 class actions for discovery purposes, especially if the collective action opt-ins is numerous.  *Hoffman-La Roche v. Sperling*, 493 U.S. 165 (1989) (noting that 216(b)'s "advantage of lower individual costs to vindicate rights is done by the pooling of resources.")  *Id.* at 170.

In *McGrath v. City of Philadelphia*, 1994 WL 45162 (E.D. Pa. Feb. 10, 1994), the court noted the following:

> It is well established that individualized discovery, such as that sought…is inappropriate in a class action lawsuit.  *Adkins v. Mid American Growers, Inc.*, 143 F.R.D. 171, 174 (N.D. Ill. 1992) (holding that an employer is not entitled to individualized discovery in FLSA class actions.)  To allow such, discovery would only serve to obfuscate the issues and drastically enhance the costs of litigation. Such a result cannot be countenanced.

*Id.* at *2.

In *Pendlebury v. Starbucks Coffee Co.*, No. 9:04-CV-80521, slip op. at 4 (S.D. Fl. Jan. 13, 2006), after the court granted plaintiffs' motion for conditional certification and the opt-in period had expired, 900 individuals opted into the action.  The court determined that in light of the nationwide scope of the litigation, all geographic areas could be represented with a total of 36 opt-in plaintiffs, or 4% of the 900 individuals who had joined the suit.  Further, defendant agreed with the

scope of discovery because it reserved the right to come back to the court at a later time to request an enlargement of discovery if necessary.  The court noted that a random sampling of a portion of the 36 opt-in plaintiffs was reasonable and stated the following:

> As plaintiffs assert, they bear the burden of proof in a motion for decertification to demonstrate that their proposed class is similarly situated.  By virtue of its relationship as the current or former employer of the opt-in plaintiffs, defendant may have special knowledge relating to the work history and particular circumstances of any given opt-in plaintiff.  Defendant would therefore be in the unique position to "cherry-pick" amongst those individuals whom it felt best supported its claim that all store managers are not similarly situated.  Consequently, allowing defendant to pick all potential persons who will be subjected to discovery may give defendant an unfair advantage over plaintiffs.

*Id.* at 4; *see also Lousardi v. Xerox, Corp.*, 118 F.R.D. 351 (3rd Cir. 1988) (permitting representative discovery of 51 out of 1,312 opt-ins, *i.e.*, 3.89%, in ADEA collective action.

Many district courts have held that individualized discovery of all or large numbers of opt-in plaintiffs is not permissible in FLSA collective actions, and that discovery should instead be limited to a representative sample.  *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1344 (N.D. Ga. 2002) ("[T]he parties were allowed to conduct full discovery from twenty-five (25) of the 300 opt-in plaintiffs, including the named plaintiffs and six (6) other opt-in plaintiffs chosen by defendant"); *Smith v. Lowe's Home Centers, Inc.,* 236 F.R.D. 354, 357 (S.D.

Ohio May 5, 2006) (finding that limiting discovery to a statistically representative sampling would both reasonably minimize the otherwise extraordinary burden imposed on the plaintiffs and their counsel and yet afford the defendant a reasonable opportunity to…establish an evidentiary basis for its defenses"); *see also Adkin v. Mid America Growers, Inc.*, 141 F.R.D. 466, 468-69 (N.D. Ill. 1992) (individualized discovery of all opt-in plaintiffs is inappropriate in an FLSA collective action and representative sampling is a permissible alternative); *Geer v. Challenge Financial Investors Corp.*, 2007 U.S. Dist. LEXIS 33499, at *13 (D. Kan. May 4, 2007) (admonishing defendant for seeking depositions of all 256 opt-ins and its failure to compromise with plaintiffs).

The FLSA authorizes an action "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated."   29 U.S.C. § 216(b).  If at trial, the testimony of "fairly representative employees" may form the basis for a determination of liability and back wages, even in the absence of testimony from all employees, the same standard should apply during discovery of FLSA collective actions.  *Brock v. Norman Country Market, Inc*., 835 F.3d 823, 828 (11th Cir. 1988) (court determined on class-wide basis that employees were misclassified as managers based on testimony of 8 managers); *Reich v. S. New England Telecomm. Corp*., 121 F.3d 58, 67 (2d Cir. 1997) (2.5% of plaintiffs testified and established liability on behalf of collective action class); *Department*

9

*of Labor v. Cole Enterprises, Inc*., 62 F.3d 775, 781 (6th Cir. 1995).

In the instant case, Plaintiffs do not propose that opt-ins subjected to depositions be randomly selected - only that a *reasonable* number be subjected to depositions.   As in *Pendlebury,* Defendant, here, has nothing to lose with conducting a reasonable number of depositions (10 depositions the parties originally agreed to in addition to another 15) because it can always reserve the right to come back and ask the Court for permission to depose more opt-ins, if it so desires.   Furthermore, the challenged practice at issue does not involve both the duties test and compensation test typically seen in other FLSA cases.   Here, the challenged action is an easy one because it involves one major issue under the compensation test:  Whether named and opt-in Plaintiffs were similarly situated with respect to a compensation practice that bases pay, in whole or in part, on time estimates or hours worked, in violation of the FLSA professional exemption requirements.[5]  If so, Clinicians were misclassified as exempt and should have been compensated for all of their hours worked, including time and one-half for

---

[5] Pursuant to 29 C.F.R. § 541.300, an employee may be classified as professionally exempt from overtime if he meets both the Compensation and Duties Test.  To meet the compensation test, an employee must either be compensated a fixed salary or "fee basis."  An employee will be considered paid on a fee basis if the employee is paid an agreed sum for a single job *regardless of the time required for its completion*….Payments based on the number of hours worked and not on the accomplishment of a given single task are not considered payments on a fee basis. *Id.*

10

hours over 40.

Defendant's arguments for individualized discovery of opt-in Plaintiffs based on *potential* variations of its compensation practice are unpersuasive and unsupported by the record.  First, Plaintiffs have limited the proposed class to include *only* Clinicians classified as <u>exempt</u> under the FLSA.[6]  Those occupations include:  Registered Nurses, Physical Therapists, and Occupational Therapists. (*See* Dkt. No. 167.) Because all Clinicians in California have been classified as non-exempt, they are not part of the proposed class.  (*See* Dkt. No. 93.)

Second, while many of Defendant's branches originally compensated its Clinicians on a salaried basis before the conversion to the PPV practice, and Clinicians may have been paid a temporary guaranteed salary during their orientation period, the record makes clear that the vast majority of Clinicians are

---

[6] Now, Defendant attempts to suggest that because some named Plaintiffs may have been inadvertently paid *de minimis* amounts of overtime on isolated occasions (compared to the excessive hours they worked over 40), they are <u>non-exempt</u> and not similarly situated to the class they represent. (*See infra* p.23.)  However, Defendant admitted, "[I]f an hourly billing code was inadvertently entered for an <u>exempt</u> Clinician on a particular week, the Company's payroll system was designed to pay overtime for all hours reported by the Clinician for the week, even though the Clinician is classified as an exempt employee." (*See* Dkt. No. 84.)  This clearly explains any inadvertent overtime paid to a named Plaintiff, and demonstrates that they were not generally classified or treated as non-exempt.  *See also*, Deposition of Lisa Rindfleisch ("Rindfleisch Dep."), at 180:13-184:17; Deposition of Tiffany Melendez ("Melendez Dep."), at 351:1-10; 364:20-25, Ex. D.

paid pursuant to the PPV plan following their initial orientation.[7]  Plaintiffs are pursuing FLSA claims on behalf of themselves and all other similarly situated Clinicians who were/are compensated on a non-salaried, PPV basis and work[ed] over 40 hours a week during <u>any</u> portion of the applicable period of time.[8]  There is no doubt this common pay practice existed, and over 50 named and opt-in Plaintiffs from coast to coast have asserted they were compensated according to this practice.  (*See generally*, all Consent to Sue Forms.)  Indeed, to promote the PPV plan across the country, Defendant created a PPV "tool kit" entitled "Pay Per Visit Program – A Requirement and Retention Toolkit," (revised many times, including in 2007).  It was distributed across their 300 plus branches and described

[7] Defendant maintains all five (5) named Plaintiffs were paid differently, but the reality is that all five (5) were compensated pursuant to the PPV plan.  The only difference among all of them was <u>when</u> their pay was converted to PPV.  Like differences in damage amounts normally found in collective/class actions, differences relating to when and how long Clinicians' PPV compensation practice applied should not defeat the class-wide compensation scheme that exists.

[8] Defendant's suggestion that two New York named Plaintiffs were guaranteed a salary throughout their entire employment period is inaccurate.  (*See*, *e.g.*, Melendez Dep. at 270: 11-24; 273:1-23; 364:20-25; *see also* Rindfleisch Dep. at 12: 3-24;17: 4-24; 274: 6-12; and 280:7-24)  Plaintiffs maintain that they were paid pursuant to the PPV plan, if they did not make their targeted weekly units, they would only be paid for the number of "units" or "visits" made weekly.  Moreover, Defendant's assertion that Plaintiffs were guaranteed salaries, notwithstanding Plaintiffs' statements that they were not paid a guaranteed salary, runs counter to Defendant's argument that vast individualized discovery of opt-ins is necessary.  If Defendant in fact knows better than individual Clinicians whether the Clinicians were guaranteed salaries, then individualized discovery of Clinicians on this issue is clearly unnecessary, unreasonable, and inefficient, and would serve only to burden Plaintiffs with duplicative discovery costs.

as the following:

**Reduce Impact Of Payroll Costs:**

> Paying associates by the visit eliminates the risk of paying salaries based on full productivity to unproductive associates.  With Pay Per Visit, Gentiva is paying for actual results.

(*See* Gentiva Pay Per Visit Program, L-RF001746 or p. 6, Exhibit E.)   As defendant's policy indicates, this conversion to the PPV practice was about "reducing payroll costs and paying for actual results."  Therefore, their own policy supports the assertions of named Plaintiffs that pursuant to this PPV practice, they were compensated based on time and not a fixed salary.  *Id.*

Third, Defendant's insistence that Plaintiffs are not paid based on time estimates or hours, or that Clinicians are not similarly situated to the named Plaintiffs pursuant to the PPV plan, thus requiring individualized discovery to show the alleged variations, is based on a misunderstanding of Plaintiffs' claims.  *Id.* at 19.[9]  Plaintiffs' contention is that the "visit fees" and "flat rates" paid to Clinicians compensated under the PPV plan are based on "time estimates;" therefore, they are inconsistent with the FLSA's professional exemption

---

[9] During the parties' early exchange of limited discovery, Plaintiffs learned Defendant uses "time estimates" for both non-patient related tasks and patient visits in determining the "visit" or "unit" value allocated to said patient visits, e.g., start-of-care (2 units); recertification (1.5 units); and discharge visits (1.5 units.) (*See* Exs. E and F.)

compensation requirements.[10]   Gentiva asserts that it *does not pay* Clinicians based

on their time spent on activities; supposedly, they are paid a "flat rate."  However,

Defendant admits, "[a] follow-up visit with a patient is most often assigned one

unit, while a visit to start care for a patient (a "*start-of-care* visit," which requires

<u>in-depth patient evaluation</u>) may be assigned 1.5 or 2 units, depending on the

branch.  (*See* Dkt No. 84, p. 7)  Regarding *non-patient related tasks*, Defendant

admits, the "non-visit" "flat-rate" is based upon the number of non-visit *hours*

*worked* because the flat rate is calculated according to hours worked.  For example,

non-visit related work that takes 0.5-1.5 hr. = 1 visit unit; 1.75 -3 hr. = 2 visit unit;

3.25-4 hr. = 3 visit unit…*Id*.  Here, Defendant's PPV tool kit corroborates that

Clinicians have been compensated pursuant to "time estimates" in violation of the

FLSA:

> Orientation, staff meetings, in-services, case conferences, or any other mandatory administrative office time that is not visit related is compensable time.  Compensation for these activities should be paid at a flat rate **based on the <u>time</u> associated with the non-visit related activity[11]**.

---

[10] Plaintiffs provide aspects of the compensation policy they challenge only to explain why Clinicians paid pursuant to the PPV plan are similarly situated, and as a result why individualized discovery on this issue is unnecessary.  However, Plaintiffs will not engage in Defendant's arguments regarding the merits of their FLSA claim or address any Department of Labor investigator statements, except to state Plaintiffs strongly disagree with Defendant's arguments as they are irrelevant to the present discovery motion.

[11] The United States Department of Labor, Wage and Hour Division is the agency

(*Id.* at Ex. E, or p. 19.)

Similarly, various emails from Gentiva's local branches and corporate personnel also prove they paid Clinicians based on time for both <u>patient</u> **and** <u>non-patient</u> related tasks in contravention of the FLSA.  For example, in August 2007, local branch offices were contacting corporate personnel for guidance on patient visits that were "extended visits"……2 hours in duration; adjusting a *Start of Care* visit to 2.5 or 3x the routine visit….*given the time it takes to do it*." (*See* August 21, 2007 email correspondence from D. Nerstad regarding PPV questions, Ex. F.)

In July 2010, regional corporate personnel communicated to All Home Health Operations that:

> [a]s an organization it was of utmost importance that pay practices <u>remain</u> consistent.  Pay practice decisions are the responsibility of the RVP and AVP of Operations as well as the Regional Human Resources Director.   Effective immediately, the following pay practices have to be implemented:  Extended mileage or travel time within the branches' coverage will be paid at .5 the visit rate if the distance is greater than 45 miles or 45 minutes; case conference time will be a pro-rated visit rate.   This time should be managed and consistent for every clinician in the location.  (Ex- Case Conference = 1 hr, only 1 hr should be paid to each clinician.  There should be no variances.)

(*See* July 27, 2010 Internal Memorandum to All Home Health Operations, Ex. G.)

---

responsible for administering and enforcing the FLSA.  Under § 541.605, a fee basis cannot be both a "flat fee" and "time" based.  If an individual is paid pursuant to their time spent on a task, then all of their hours worked must be counted, and hours over 40 in a workweek must be paid at time and one-half.  *See* 29 C.F.R. § 778.100.

Because Plaintiffs' allegations regarding the time-basis for their pay is consistent with Gentiva's centralized PPV compensation policy, and because Gentiva's records reflect which Clinicians are compensated according to this policy, vast individualized discovery of opt-ins on the terms of the compensation policy is unnecessary and unreasonable.[12]

Limiting depositions to a *total* of 25 would provide a representative sampling of all geographic locations. This number will provide Defendant with a sufficient basis to determine whether or not Clinicians paid pursuant to this PPV plan were/are similarly situated while still maintaining litigation efficiencies and costs to a reasonable amount. Thus, Plaintiffs' proposal for 25 total depositions to explore claims, damages, or defenses is reasonable to either support a potential Motion for Decertification or argue against the same.

Defendant also maintains that three (3) hours to depose each opt-in Plaintiff is not enough time to determine any potential variations in their compensation structure. Defendant asserts it needs seven (7) hours. [13]   However, the FLSA

---

[12] Also, Defendant attempts to convince the Court it compensated its Clinicians according to *various* pay practices, the reality is that this nationwide pay scheme has existed across more than 350 branches for quite some time. In fact, Defendant's CEO, Tony Strange, in a shareholders' July 2010 meeting admitted that close to 90% of the Clinicians were compensated on a PPV basis, up from the high 70s to low 80s in the preceding year. Undoubtedly, Defendant's pay practice of choice was a PPV model. (*See* Dkt. No. 93, Ex. A.)

[13] Since Defendant attempts to justify vast opt-in discovery *only* to determine

Duties test is not contested, and Plaintiffs have limited their claims to only the period of time when Clinicians were compensated on a PPV basis and worked in excess of 40 hours.  Defendant should be able to establish within a three (3) hour period whether or not such opt-in Plaintiffs were similarly situated to the named Plaintiffs with respect to the relevant compensation practice.

Given these facts, there is no legitimate reason to subject an opt-in Plaintiff to a full 7-hour deposition.  "[T]he district court does have discretion to limit the scope of discovery." *Credit Lyonnais v. SGC Int'l, Inc*., 160 F.3d 428, 431 (8th Cir. 1988); *see also Smith,* 236 F.R.D. at 356; (In large complex litigation, the court may limit the scope of discovery to protect a party from unduly burdensome discovery requests); *Geer*, 2007 WL 1341774 (D.Kan. May 4, 2007) (finding "the burden and expense the requested discovery would impose on Plaintiffs clearly outweighs the likely benefit.")  Therefore, depositions should be limited to three (3) hours in length as opposed to seven (7).

With respect to written discovery, Defendant seeks to serve 100 opt-in Plaintiffs with 15 interrogatories, 15 requests for production, and 15 requests for

whether opt-ins were compensated pursuant to the PPV plan or on a salaried basis, (*see infra*. p. 26 – 28) then discovery should be limited for that purpose.  A total of 25 depositions at three hours in length, and 10 interrogatories, 10 requests for admissions, and 10 document requests served upon a maximum of 50 randomly selected opt-ins are reasonable.  Otherwise, there is no justification for vast opt-in discovery that is actually intended to run up Plaintiffs' costs and discourage Plaintiffs from pursuing their claims.

admissions which would likely include many sub-parts to each question.  The

Court has the authority pursuant to Rule 26(c) to "make any order which justice

requires to protect a party or person from annoyance, embarrassment, oppression,

or undue burden or expense." *Cranney v. Carriage Services, Inc.*, No. 2:07-cv-

01587-RLH-PAL, 2008 WL 2457912 (D. Nev. June 16, 2008); *Fast v. Applebee's*

*International, Inc.*, No. 06-4146-CV-C-NKL (W.D. Mo. Dec. 31, 2008).   In

*Applebee's*, the Court <u>denied</u> Defendant's Motion to Compel Responses to

Interrogatories served upon hundreds of opt-in Plaintiffs.[14]  The *Applebee's* court

held:

> [G]iven the remedial nature of  FLSA actions and the hybrid status of
> opt-in plaintiffs, any such discovery must satisfy the following
> requirements:  1)The discovery is not being sought for the purpose of
> depriving the opt-in plaintiff of his or her class status; 2) the discovery
> process is simple enough that it does not require the assistance of
> counsel to answer; 3) the discovery meets the standards of Federal
> Rule of Civil Procedure 26; and 4) the information is not otherwise
> available to the defendant.  These limitations are imposed to insure
> that discovery is not used as a tool to limit or discourage participation
> in the opt-in class and to advance the efficiency and cost containment
> objectives of FLSA actions.

*Id*. at 2.

---

[14] While the *Applebees* court considered the short time frame in which defendant
served opt-in plaintiffs with such burdensome requests, its focus was primarily on
the purpose of such requests.  The *Applebee's* defendant served interrogatories
which asked plaintiffs for their (1) shift worked, describing each activity
performed; (2) identifying different shifts; (3) accounting for different time
throughout the shift(s); (4) identifying processes for which they formulated
responses; (5) and with whom they discussed their responses.

In *Applebee's,* defendant served opt-in plaintiffs with *only* interrogatories, but the court held defendant had failed to show these threshold requirements because:  1) the detailed information requested was impossible for the normal person to answer, therefore, such requests were unduly burdensome, (irrespective of the number of opt-ins required to answer); 2) since the information sought would be *reconstructed* by an opt-in Plaintiff, defendant had access to such information through its own records; and 3)  given that the discovery required the assistance of counsel, this added to the length and time to answer.  *Id*.  Essentially, allowing Defendant to engage in individual discovery with such detailed and extensive written requests negates the purpose behind limited discovery in representative actions.  *Morales v. Farmland Foods, Inc.*, No. 8:08CV504 2010 WL 4941708 (D.Neb. Nov 30, 2010).

To allow Defendant to select and serve such burdensome requests upon 100 opt-in Plaintiffs of their choice would undoubtedly have the same deterring effect considered by the *Applebee's* court.  To prove this point, the *Applebee's* defendant served opt-in plaintiffs with interrogatories *relating to their employment activities* to determine whether they were similarly situated.  Here, Defendant maintains it should be allowed to obtain any and all information regarding Plaintiffs' whereabouts during the applicable three (3) to six (6) year period.  (*See* March 3, 2011 email correspondence from Angelo Spinola, Ex. H.)  Although the email

19

relates to preservation efforts, the information requested relates to discovery issues in dispute which would also apply to the opt-in Plaintiffs. (*Id*.)  This information would include <u>all</u> financial information (including but not limited to, tax records) during the applicable period of time, in addition to their minor children's school records (not used to determine whether Clinicians were/are similarly situated with respect to the compensation practice) but to attempt refuting the asserted hours worked.

Should Defendant be allowed to serve 100 opt-in Plaintiffs of their choice (rather than randomly selected) with 15 detailed interrogatories – with likely sub-parts, 15 requests for production, and 15 admission requests, opt-in Plaintiffs will inevitably be discouraged and deterred from exercising their rights because of the overly broad, personal, and burdensome nature of such requested information. Plaintiffs do not contend, however, that Defendant should be denied its ability to conduct its discovery.  Fairness dictates that such discovery should be afforded to both sides, but with respect to opt-in Plaintiffs, such discovery should be reasonable.   Thus, Plaintiffs respectfully request the Court to limit written discovery to a random sampling of opt in Plaintiffs (two to three percent of the opt-in Plaintiffs but not to exceed 50) with a maximum of 10 interrogatories, 10 requests for production, and 10 requests for admissions is reasonable.

b. Defendant's Argument in Support of Its Opt-in Discovery Proposal[15]

Plaintiffs in this case have chosen to pursue a remedy under the Fair Labor Standards Act's ("FLSA") "collective action" mechanism, which is controlled by 29 U.S.C. § 216(b).  Under the plain language of 29 U.S.C. 216(b), filing a consent to join a collective action means the "employee shall be a party plaintiff."  Accordingly, there is no difference between an "opt-in plaintiff" and a "named plaintiff" in the context of a FLSA collective action.  Each Plaintiff here, whether an opt-in or a named Plaintiff, is subject to full discovery, including depositions and written discovery, particularly when a case still is in the stages prior to decertification briefing.  *See, e.g., Brooks v. Farm Fresh, Inc.*, 759 F. Supp. 1185, 1187 (E.D. Va. 1991) (allowing depositions of all 125 plaintiffs for purpose of

---

[15] Defendant has renewed its opt-in discovery efforts in accordance with the proposed limitations set forth herein.  It is not permissible for Plaintiffs to prohibit opt-in discovery indefinitely.  Further, Plaintiffs have provided no authority suggesting that they can delay discovery of opt-in Plaintiffs who have joined this case and, in many cases, submitted declarations is support of their position, until after the motion for conditional certification is decided.  Plaintiffs' position is particularly inequitable given the fact that Plaintiffs' have served class based discovery to which Defendant has responded.  The discovery deadline in this case was recently extended once as a result of Plaintiffs' unilateral prohibition of opt-in discovery and Defendant does not want to be in a position where it is unable to conduct adequate discovery within the period provided by the Court.  (*See* April 13, 2011 email correspondence between A. Spinola and F. Horne, attached as Ex. I.)  In addition, to the extent the Court intends to decide this and the other discovery issues absent the requested case conference, Defendant respectfully requests that the Court grant Defendant the opportunity to file a motion to compel and fully brief these issues.

21

"help[ing] the Court determine whether the named plaintiffs, opt-in plaintiffs, and potential plaintiffs were 'similarly situated' under the FLSA"), *rev'd on other grounds sub nom*.   Despite this fact, Defendant has proposed a reasonable, streamlined discovery plan that would allow for discovery regarding a limited sample of opt-in Plaintiffs.[16]

The Eleventh Circuit Court of Appeals and district courts in this Circuit have held that discovery on opt-in plaintiffs is appropriate in an action seeking collective action certification because these individuals "[h]aving opted into the litigation ... are not 'passive' in the same sense as absent Rule 23 class members." *Luna v. Del Monte Fresh Produce (Se.), Inc.*, 2007 U.S. Dist. LEXIS 36893, *22 (N.D. Ga. May 18, 2007) (citing *Gonzales v. Hair Club for Men, Ltd., Inc*., 2007 U.S. Dist. LEXIS 26160 (M.D. Fla. 2007)); *see also Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1556 (11th Cir. 1986).   Accordingly, Gentiva's discovery related to opt-in Plaintiffs is appropriate in the present case.

Gentiva seeks the right to depose a minimum of 50 percent of all opt-in Plaintiffs or 50 opt-in Plaintiffs, whichever is greater, with a cap of 100 opt-in depositions regardless of the ultimate size of the class (if any).   This is but a

---

[16] Ironically, by agreeing to limit discovery to a representative sample, Defendant has complied with Plaintiffs' request.   However, Plaintiffs' suggested limitations are so restrictive that compliance with the same would preclude meaningful discovery.   Plaintiffs have provided no authority suggesting the restrictions they suggest are warranted.

fraction of the potential class estimated to be over 10,000 individuals. This limited plan for discovery should put to rest any concerns of Plaintiffs regarding the potential size of the opt-in class. Gentiva also does not agree with Plaintiffs' proposal to serve written discovery on a random selection of opt-in Plaintiffs. Plaintiffs have provided no authority to suggest that it is improper for Gentiva to select the witnesses on whom it wishes to serve written discovery. In fact, in *Pendlebury v. Starbucks Coffee*, a case Plaintiffs rely upon in support of their discovery position, the court rejected the plaintiffs' request to allow discovery of an entirely randomly selected sample group, finding that such a practice would "unduly prejudice" the defendant. *See Pendlebury*, No. 04-cv-80521, slip op. at **4-5. Rather, the court permitted the defendant to select for deposition 24 of the 36 opt-in plaintiffs allowed. Gentiva likewise would be prejudiced by Plaintiffs' unconventional and unsupported random sample model for written discovery. Plaintiffs' reliance on a proposal rejected by the Court only highlights the dearth of authority in support of random selection. Further, Plaintiffs' counsel certainly did not randomly select the opt-in Plaintiffs who provided declarations in support of their claims. Rather, they likely interviewed and selected those individuals they thought would best support their theory. To now suggest that Defendant cannot serve written discovery on those same individuals who chose to opt-in to the case and then chose to provide a written declaration containing numerous allegations

23

against the Defendant unless their names are randomly selected from a hat is absurd.

Gentiva's proposed model for depositions and written discovery is not only supported by case law but is more conservative than what courts have permitted in other cases. *See, e.g., Abubakar v. City of Solano*, No. CIV S-06-2268 LKK EFB, 2008 U.S. Dist. LEXIS 17456, at *10 (E.D. Cal. Feb. 22, 2008) (refusing to limit to "representative group," written and deposition discovery served on 160 opt-in plaintiffs in FLSA collective action); *Kaas v. Pratt & Whitney*, 1991 U.S. Dist. LEXIS 11177 (S.D. Fla. 1991) (authorizing depositions of all 100 opt-in plaintiffs); *Brooks*, 759 F. Supp. at 1187 (allowing defendants to depose all 127 plaintiffs, including 125 opt-in plaintiffs).

Plaintiffs assert several merit based arguments purportedly to support their position that their proposed restrictions on discovery are reasonable. While this motion is not the proper venue for such arguments, a general overview of the claims Plaintiffs assert provides a helpful context for the Court to understand the need for broader discovery than that proposed by Plaintiffs. As Plaintiffs note above, their theory of the case is as follows: "Plaintiffs allege that Defendant paid them, and the putative class members, under an unlawful hybrid pay plan that included a combination of 'Pay Per Visit,' and hourly pay and further did not pay them for all hours worked." (Pls.' Initial Disclosures, p. 1 (certificate of service at

24

Dkt No. 86).)

Plaintiffs' theory is based entirely on limitations to the way exempt Clinicians may be paid using the "fee basis" method of compensation. (*See* Dkt No. 57, pp. 4-7, 13-17.) Plaintiffs assert that any exempt Clinician paid on a fee basis (*i.e.*, using visit rates) cannot be paid a "fee" (flat visit rate) for specific tasks and an additional hourly rate of pay for other tasks. However, Plaintiffs concede that their claims do not apply to Clinicians paid on a "salary basis." This is because employers who pay exempt employees on a "salary basis" (*i.e.*, a predetermined amount on a weekly or less frequent basis of at least $455 each week, per FLSA § 213(a)(1)) may also pay these exempt employees additional compensation based on hours worked (or any other basis) without affecting exempt status. *See* 29 C.F.R. §§ 541.602. Consequently, a threshold question that must be answered before a particular Plaintiff can even assert a valid claim under Plaintiffs' theory is whether the employee is paid on "fee" or "salary" basis.

Plaintiffs correctly acknowledge that those Clinicians paid a bi-weekly salary do not have viable claims because they are "salary" basis employees. *See* Section I.A.2.a. *supra* pp. 11-12. However, they incorrectly conclude that all Clinicians paid under the PPV compensation model are "fee" basis employees. In reality, several Clinicians paid under the PPV compensation model, including four of the five named Plaintiffs, were paid on a "salary" basis and, therefore, cannot

25

assert a claim.  While Plaintiffs claim herein that they were not always paid on a "salary" basis, they can point to no evidence to support their position.  Indeed, all five named Plaintiffs acknowledge they did not understand how they were paid. (*See* Melendez Dep. [17] at 26:25-27:4 ("Q. ... You don't know how billing took your time slip and then figured out what you'd be paid based on that time slip, correct? A. Correct."), 243:12-19 and 364:9-367:20; Rindfleisch Dep. at 262:25-263:14 (responding "I don't really know" to question regarding how she was paid for certain work activities); Deposition of Christina Nelmes ("Nelmes Dep."), at 41:3-42:4, 52:4-12 ("I honestly have no idea how I got paid.") and 176:22-177:3 ("I honestly don't know how they based what they paid me on [sic]."); Baker Dep. at 106:18-23, 149:19-24 (stating that she does not know how she was paid for certain activities because "the compensation was confusing and [sic] never fully got clarification of the compensation.") and 226:8-17; Deposition of Michele Gentile ("Gentile Dep."), at 41:25-42:3 (admitting she is "not really sure" what is included in her pay rates) and 50:8-51:2, excerpts from the named Plaintiffs' deposition

---

[17] Plaintiffs' claim that the testimony of Plaintiff Melendez establishes that she was not receiving a minimum salary guarantee is misleading.  Plaintiffs only cite to a few lines of testimony where Plaintiff Melendez claims that a sum of money associated with a particular pay code did not represent "guaranteed" or salaried pay.  However, by reviewing the testimony immediately following what Plaintiffs' cited, Plaintiff Melendez states that she has no idea what the sum of money or the pay code was compensating her for.  Defendant attaches the entire relevant portion of the transcript for the Court's convenience.

transcripts collectively are attached hereto, in the order referenced, as Ex. J).) Therefore, they cannot now claim they were not paid minimum guaranteed salaries.

The three named Plaintiffs in New York were exclusively paid on a bi-weekly salary and, after converting to the PPV method of compensation, received a minimum salary guarantee until they resigned their employment. (*See* Declaration of Dee Russell ¶ 13, 14, 17, 18, attached as Ex. K.)   One of the two named Plaintiffs in North Carolina remained in orientation during the entire period of her employment and, as a result, would have been subject to a minimum salary guarantee throughout her employment. (*See* Nelmes Dep., at 171:1-8, attached as Ex. L; Declaration of Jo Anna Dail ("Dail Decl."), at ¶¶ 2-3, attached as Ex. M.) Consequently, these individuals do not have valid claims.

These facts are important in the discovery context because they establish that individual inquiry is required to determine whether a particular PPV Clinician is paid under a "fee" basis or a salary basis.   This is because, unlike bi-weekly salaried employees, there are no central records of all the PPV Clinicians who receive minimum salary guarantees.  (*See* Declaration of Kathleen Shanahan, Dkt. No. 84-3, at ¶ 17 and Declaration of Diane Wehby, Dkt. No. 84-6 at ¶¶ 8-9.) Rather, the decision to pay a PPV Clinician on a "salary" basis is typically made at the branch level. (*See* Dkt Nos. 84-3 at ¶17 and 84-6 at ¶¶8-9.)  As such, Plaintiffs'

proposed limitations on opt-in discovery are insufficient.  If 80% of the named Plaintiffs cannot assert a claim, what percentage of the purported class is similarly barred from asserting a "fee" basis claim?

The determination of whether a Clinician was paid on a "fee" or "salary" basis is only one of the numerous issues that require individualized discovery that is significantly broader than what Plaintiffs propose.  For example, Gentiva utilizes several different pay models for "fee" basis Clinicians that are not implicated by Plaintiffs' "hybrid" compensation theory.  These individuals do not have valid claims.  Plaintiffs attempt to cast the numerous differences in the compensation practices associated with the proposed class as variations that only impact potential damages.  In reality, just as with the question of whether Clinicians are paid under a "fee" or "salary" basis, these inquiries relate directly to whether the vast majority of the purported class can even state a claim.  Gentiva utilizes several different pay models for "fee" basis Clinicians that are not implicated by Plaintiffs' "hybrid" compensation theory.

In addition to the above, discovery is needed with respect to Plaintiffs' central claim that Gentiva paid them using an unlawful combination of a "per visit rate" for some work and "an hourly rate basis for other work."  (Dkt. No. 57, pp. 4, 17.)  Many Plaintiffs submitted statements claiming that Gentiva paid them by the hour.  (*See* Dkt. No. 57, pp. 4-5 (alleging "hourly rate basis" for some work;

"hourly rate" for conferences and meetings.))   In its Opposition to Plaintiffs'
Motion for Conditional Certification (Dkt. No. 84), Gentiva demonstrated
conclusively that its policies prohibit hourly compensation of its exempt Clinicians
paid on a fee or PPV basis.  Gentiva's fee-basis model is consistent with applicable
authority and the requirements of 29 C.F.R. § 541.605.   However, Plaintiffs
expend considerable efforts in this motion attempting to convince the Court that
Gentiva's fee-basis model violates the law.   Plaintiffs rely on portions of
documents and communications that they clearly do not understand which are out
of context and without foundation.  Similarly, without any supporting authority,
Plaintiffs claim that Gentiva distributed the PPV Toolkit to its "300 plus branches."
*See* Section I.A.2.a. *supra* p. 12.  Plaintiffs do so in a misleading attempt to create
a policy or practice that does not exist.  Plaintiffs' references are taken out of
context and incorrectly present Plaintiffs' own flawed, uninformed interpretation
of the documents and their significance as facts.[18]   Plaintiffs also incorrectly
attribute to Defendant the quote: "Defendant admits, the 'non-visit' 'flat-rate' is
based upon the number of non-visit *hours worked*."  *See supra* p. 14.   This
reference to Defendant's supposed admission is from the Court's Order granting

---

[18] Rather than address those arguments and portions of documents here, Defendant
will wait until the appropriate stage of the case to respond to merit based
arguments.

Plaintiffs' Motion for Preliminary Certification as a Collective Action and Issuance of Notice under the FLSA. (Dkt. No. 167).[19] Defendant has made no such admission, either in its memorandum opposing preliminary collective action certification or otherwise.  In fact, Defendant repeatedly has stated that "Gentiva's practice and policy prohibits paying exempt Clinicians by the hour." (Dkt. No. 84 at 9.)  Again, Gentiva believes the PPV compensation model and computation of flat rates fully complies with the law, as confirmed by the United States Department of Labor ("DOL")(discussed immediately below).

What Plaintiffs fail to mention is that the DOL, the agency Plaintiffs acknowledge is "responsible for administering and enforcing the FLSA," has expressly concluded on several different occasions that Gentiva's compensation model satisfies the fee-basis requirements as long as exempt, fee-basis Clinicians are paid using flat rates.  (*See* Dkt. No. 110-1, at Section V.A., pp. 12-15.)  The DOL drew this conclusion after conducting an analysis of the compensation records of Gentiva Clinicians.  (*See id.*)  In fact, the DOL has taken the position that the exempt status of a fee-based Clinician was only invalidated on a workweek where a timekeeper inadvertently paid the Clinician by the hour, which was infrequent.  (*See* Declaration of John Karr, Dkt. No. 110-2, at ¶¶ 9, 19.) Thus, at

---

[19] The Court acknowledged in its Order that it was not determining the merits of Plaintiffs' compliant or resolving the factual disputes.  (*See* Dkt. No. 167 at 5.)

least according to the DOL, only exempt, fee basis Clinicians paid by the hour, rather than a flat rate, could potentially have a claim under Plaintiffs' theory. While many Plaintiffs claimed in a conclusory manner that they were paid by the hour for certain activities in their declarations, they conceded at deposition that they were not.  (*See, e.g.,* Gentile Dep. at 132:21-23 ("never was" paid by the hour for any of her work); Nelmes Dep. at 48:14-15 ("there's a huge discrepancy" between how many units she was paid for work versus how many hours she should have been paid if she were hourly) and 51:8-52:3 (testifies that she was paid the same amount if she worked 40 hours to complete 30 units in a week, as if she worked 60 hours to complete 30 units in a week); Melendez Dep. at 65:22-25 (testifying she "got a set unit for whatever type of visit is was, regardless of the time spent."); Baker Dep. 178:5-9 (admits that her understanding was that she would be paid the same amount for a particular type of visit regardless of how long it took to complete the visit) and 181:16-18 (testifies that she is paid for an hour and a half of work at $33, and was paid the same $33 for a half-hour of in-service education time); Rindfleisch Dep. 31:8-11 ("technically, they were still correlating units with hours, but we weren't paid hourly."), excerpts from the named Plaintiffs' deposition transcripts collectively are attached hereto, in the order referenced, as Ex. N.)  Therefore, discovery is necessary to establish whether a fee basis Clinician is compensated by a combination of visit rates and hourly pay or by

a lawful combination of visit rates and flat rates of pay.

There were other differences in the way that the named Plaintiffs (who were all classified as exempt Clinicians) were compensated that must be fleshed out in discovery.  This fact is evidenced by the variation in the compensation practices associated with just the named Plaintiffs alone.  For example, at least two of the named Plaintiffs were paid at least some overtime. (*See* Melendez Dep. at 354:5-24; Rindfleisch Dep. at 180:3-181:3, excerpts attached as Ex. O.)  The payment of overtime to some potential class members and not others constitutes a material difference that deems class treatment improper.  *See e.g., Brooks v. A Rainaldi Plumbing, Inc.*, No. 6:06-cv-631, 2006 U.S. Dist. LEXIS 89417, at **6-7 (M.D. Fla. Dec. 8, 2006)(denying conditional certification in part because some employees were compensated via varying payment methods, and "it [would be] difficult to ascertain a group of individuals that would be [more] dissimilar.").

Further, even those named Plaintiffs employed at the same location testified that they were not compensated for the same activities in the same manner and received different instructions as to completing paperwork and recording time. (*See* Gentile Dep. 213:8-14 and 335:4-22 (understood policy was to record all charting time and that she was required to record actual time worked during employment at Auburn branch); Nelmes 107:9-17 (did *not* think she was supposed to record all charting time during employment at Pollocksville branch); Melendez

Dep. 254:21-255:18 and 285:15-22 (recorded some charting time but not other charting time during employment at Auburn branch); Baker Dep. at 126:15-127:8 and 128:10-22 (says supervisor told her *not* to record charting time and not to report more than 40 hours of work per week during employment at Pollocksville branch); Nelmes Dep. at 96:9-22 (all travel time included in visit pay and not paid separately during employment at Pollocksville branch); Baker Dep. 29:5-16 (occasionally paid additional amounts for travel time during employment at Pollocksville branch); Melendez Dep. 257:4-18 (*not* paid for time spent in office correcting paperwork and visit notes during employment at Auburn branch); Rindfleisch Dep. at 30:6-10 (paid separately from visit pay for paperwork corrections during employment at Auburn branch); Baker Dep. at 51:6-52:13 (told if visit was longer than two hours, she would receive additional pay for visit during employment at Pollocksville branch); Gentile Dep. at 192:2-5 (if visit lasted more than two hours she did *not* receive extra pay for visit during employment at Auburn branch); Baker Dep. at 97:12-15 and 98:17-99:1 (says she was paid hourly for certain tasks during employment at Pollocksville branch); Gentile Dep. at 132:21-23 ("never was" paid by the hour for any of her work during employment at Auburn branch); Melendez Dep. at 288:3-6 and 314:19-23 (lots of mistakes in payroll at Auburn branch because former payroll clerk was drunk at work); Rindfleisch Dep. at 176:21-25 (says she was not paid for all visits worked during

employment at Auburn branch), excerpts from the named Plaintiffs' deposition transcripts collectively are attached hereto, in the order referenced, as Ex. P.)

Plaintiffs correctly state above that the testimony of "fairly representative employees" is necessary to establish that class treatment is appropriate because the class must be so similarly situated that testifying Plaintiffs can effectively form the basis for a determination of liability and back wages, even in the absence of testimony from all employees. *See* Section I.A.2.a. *supra* p. 9. Defendant requested that the Court permit discovery on the named Plaintiffs prior to deciding on Plaintiffs' motion for conditional certification to demonstrate that the variations in pay practices for these five individuals alone would establish that class treatment was not appropriate. (Dkt. No. 66 at 2.) Defendant maintains that the testimony cited above establishes this point precisely. Plaintiffs' counsel's suggestion that these are just "minor distinctions" is belied by the testimony of their own clients. Defendant asserts that, similar to the five named Plaintiffs, who were employed in only two offices, there will be many variations in pay practices with respect to other Clinicians employed in the other approximately 318 offices should they choose to join this case. Defendant is entitled to conduct discovery with respect to those differences. Consequently, Plaintiffs' claim that conducting several depositions is unnecessarily duplicative is without merit and contrary to the established record.

As illustrated above, discovery is necessary to establish whether the vast majority of potential class members can even assert a claim. However, an equally important purpose of this discovery is to determine whether class treatment is appropriate in a case in which pay practices vary this significantly. The named Plaintiffs are not sufficiently similarly situated to represent each other, let alone a class of over 10,000 Clinicians. As an example, one Plaintiff testified that, despite recording only 13 hours of work over one work week, she could possibly have worked as many as 58 hours. (*See* Nelmes Dep. at  190: 11-191:11, excerpt attached as Ex. Q.) This is because she purportedly did not record her all of her working time on her time sheet in violation of Gentiva policy. However, several Clinicians submitted declarations confirming that they understood and followed this policy by recording all of their work time. (*See, e.g.,* Dkt. No. 84, Ex. H, ¶¶ 13-14, Ex. K, ¶ 18, Ex. P, ¶¶ 18-21, Ex. R, ¶¶ 20-24, Ex. S, ¶¶ 17-21, Ex. HH, ¶¶ 16-17.) Several of the named Plaintiffs admitted to understanding the policy and at least one confirmed that she recorded all of her working time after converting to the PPV model and becoming aware of the policy. (*See* Gentile Dep. at 213:8-14, 289:5-20 and 335:4-22, excerpts attached as Ex. R.) If some Clinicians report all of their time while others do not, how would it be possible to adjudicate any overtime claim fairly? For Plaintiff Gentile, 13 hours means 13 hours, whereas for Plaintiff Nelmes 13 hours could mean 58. In short, if Plaintiffs did not experience

35

the same compensation practices, how could they sufficiently represent the interests of absent class members?  If Defendant was able to uncover this degree of variation in pay at just two offices, how likely is it that the practices will be different be like in the other 316?  Defendant's discovery proposal will allow the parties to start to answer these questions.  For these reasons, Gentiva maintains that it has proposed a reasonable model for opt-in Plaintiff discovery than is wholly consistent with the weight of the authority and is necessary for the development of this case.[20]

Gentiva also maintains that three hours to depose each opt-in Plaintiff is not enough time given the variation in the compensation structure and other differences among the named and opt-in Plaintiffs.  Federal Rule of Civil Procedure 30(d) provides up to seven hours for a deposition, and Plaintiffs have not provided Gentiva with any legitimate reason to limit the depositions to less

---

[20] Gentiva also should be allowed to propound written discovery and obtain oral discovery from opt-in Plaintiffs due to constitutional due process concerns.  If only representative discovery is allowed, or opt-in discovery is unnecessarily limited, Gentiva may be liable for damages to individual plaintiffs against whom Gentiva may have had viable, yet factually undeveloped, defenses.  Arguably, this result runs afoul of Gentiva's due process guarantees to "defend oneself" under the Fifth and Fourteenth Amendments to the United States Constitution.  *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370-372 (D.N.J. 1987) ("To proceed without permitting [the defendant] to raise at the liability stage of trial each and every defense available to it where each potential class member is readily identifiable and must step forward in order to assert and prove an individual claim for liability or at least be the subject of a defense particular to such plaintiff would deprive defendant of the Fifth Amendment right to due process.").

than half of that time. Opt-in plaintiffs are considered party plaintiffs in the exact same manner as named plaintiffs and should not be treated differently. *See e.g., Cameron-Grant v. Maxim Healthcare Serv., Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003) (stating that Section 216(b) plaintiff has no claims that he is entitled to represent other plaintiffs and must stand on merits of his own personal claim). Gentiva needed more than four hours for each deposition of named Plaintiffs, and either the full seven hours permitted under the Federal Rules, or close to it, for three out of the five depositions, as a result of the variations in compensation methods and the document and fact intensive nature of the case. (*See* Declaration of Angelo Spinola, attached as Ex. S, stating durations of five named Plaintiffs' depositions.) Gentiva does not anticipate that the depositions of the opt-in Plaintiffs will take any less time. Further, although Plaintiffs suggest that Gentiva will not need to conduct much investigation into the "duties" of clinicians, Plaintiffs recently served Gentiva with a notice of 30(b)(6) deposition including topics specifically inquiring as to the duties of clinicians. That said, Gentiva is willing to stipulate to limiting the depositions of opt-in Plaintiffs to six hours each, based on Plaintiffs' confirmation that the only issue in dispute in this litigation is whether the PPV method for compensating Clinicians disqualifies them from being classified under the professional exemption of the FLSA.[21] Gentiva's position is

---

[21] Plaintiffs have explained that they are not challenging any aspect of the

that six hours to depose each of the opt-in Plaintiffs is appropriate and will provide Gentiva with enough time to conduct its depositions.

Gentiva proposes that the same model outlined above for depositions should apply to written discovery of opt-in Plaintiffs.  As such, Gentiva would be entitled to serve written discovery on at least 50 of the opt-in Plaintiffs, up to a maximum of 100 opt-in Plaintiffs.  This position is supported by relevant case law from the Eleventh Circuit.  *See generally*, *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1244 (11th Cir. 2008) (discussing that district court granted defendant leave to use Rule 33 to serve discovery on every opt-in plaintiff who had not been deposed (approximately 1,850 opt-in plaintiffs)).

Plaintiffs' position on the number of opt-in Plaintiffs to be served with written discovery is not supported by Plaintiffs' authority.  In support of their proposal for opt-in discovery, Plaintiffs rely on *Geer*, 2008 U.S. District LEXIS 334499, at *8.  Plaintiffs refer to the *Geer* court's decision that the defendant could not seek discovery of all 256 of the opt-in plaintiffs to support their proposal for limiting the number of opt-ins subject to discovery.  However, in *Geer*, the Court was more focused on the fact that the defendants sought to depose *all* of the opt-in plaintiffs than on the actual number of opt-ins involved in making its determination

---

classification of Clinicians as exempt professional employees other than the manner in which they were compensated under the pay per visit program.

that the parties should continue to try to reach agreement on the discovery issues and quashing the defendants' deposition notice. *Id.* at \*14 ("Under the present facts, Defendants have not convinced the Court that oral depositions of *all* opt-in plaintiffs are necessary.") (emphasis added).  Even more significant, the *Geer* court held that the defendants' reliance on *Brooks*, 759 F. Supp. at 1187, in support of their position was "not particularly persuasive because the number of opt-in plaintiffs involved were not substantial." *Geer*, 2007 U.S. Dist. LEXIS 33499, at \*8.  As previously noted, the court in *Brooks* allowed depositions of 127 plaintiffs, including 125 opt-in plaintiffs for the sole purpose of "help[ing] the Court determine whether the named plaintiffs, opt-in plaintiffs, and potential plaintiffs were 'similarly situated' under the FLSA." *Brooks*, 759 F. Supp. at 1187.  In the present case, the greatest number of opt-in plaintiffs that Defendant could possibly depose is even less than the number the Court found to be "not substantial" in *Geer*.

In addition, Plaintiffs' reliance on *Pendlebury* in support of their proposal to limit the number of opt-in plaintiffs to be subject to discovery is ineffective. Distinguishable from the present case, as Plaintiffs point out, in *Pendlebury* the defendant *agreed* with the plaintiffs' suggested percentage of the opt-in class to be subject to depositions and written discovery. *See Pendlebury*, No. 04-cv-80521, slip op. at 2.  As such, there was no dispute for the court to resolve in that regard.

39

Further, Plaintiffs' suggestion that the Court should limit discovery based on the amount of Plaintiffs' testimony relied on to determine liability in *Brock*, *Reich*, and related cases, is irrelevant to the parties' present dispute in this action, where the focus of discovery is to identify the differences and/or similarities between the individuals for purposes of determining whether a collective and/or class action is appropriate, rather than on proving liability.  As noted above, Defendant asserts that at least four of the five named Plaintiffs cannot even assert <u>valid</u> <u>claims</u> under Plaintiffs' theory of the case and believes this will be the case for the vast majority of potential class members.

Similarly, Plaintiffs' references to *Fast v. Applebee's International, Inc.* in support of their suggested limit on the number of written requests to be served are misplaced as *Fast* is clearly distinguishable from this case.  In denying the defendant's motion to compel responses to interrogatories, the *Fast* court focused on the fact that the defendant served discovery requests calling for detailed interrogatory responses from 300 opt-in Plaintiffs only two months before the close of discovery.  *See Fast*, 2008 U.S. Dist LEXIS 105159, No. 06-4146-CV-C-NKL, at \*\*3-4.  The *Fast* court also based its decision on the specific substance of the interrogatory requests in that case, which included requests for responses detailing the plaintiffs' employment schedule. *See id.* at \*\*3-4.  Here, Gentiva intends to serve its discovery requests well in advance of the discovery deadline and its

discovery requests are quite typical of those used in collective actions.

Gentiva has been working to resolve the discovery disputes discussed herein for the exact purpose of efficiently proceeding with discovery.  In addition, the information sought in Gentiva's intended discovery requests is not information that Gentiva can retrieve from its own records.[22]  Even more, in *Fast*, the court did not limit the number of written discovery requests or reduce the number of requests to be served on opt-in plaintiffs.  In fact, the court did not even address the issue of limiting the number of interrogatories served on opt-in plaintiffs.  Accordingly, Gentiva fails to see how these cases advance Plaintiffs' position.  Instead, these decisions are consistent with Gentiva's proposal.

Gentiva also does not agree with Plaintiffs' proposal to limit interrogatories, document requests, and admissions to approximately ten of each for each opt-in Plaintiff (under Plaintiffs' proposal, two to three percent of the opt-in Plaintiffs but not more than 50).  Gentiva proposes a limit of fifteen interrogatories, fifteen

---

[22] Plaintiffs' reference to part of an email sent to Plaintiffs' counsel concerning Plaintiffs' preservation efforts is unrelated to the dispute at issue.  The reference to this email is misleading as the email was merely attempting to confirm that Plaintiffs' counsel had taken steps to preserve the documents requested via written discovery and does not accurately present Gentiva's intended substance of its discovery requests.  Further, Plaintiffs omit the remainder of the sentence that specifically identifies the need to preserve the exact type of documents requested in Defendant's routine written discovery.  Thus, no distinction can be made between the partial sentence Plaintiffs' counsel cite to and those written discovery requests at issue here.

document requests, and fifteen admission requests for each opt-in Plaintiff and notes it is not obligated to agree to any such compromise.  *See generally*, *Morgan*, 551 F.3d at 1244 (discussing that district court granted defendant leave to use Rule 33 to serve 25 interrogatories on each of the approximately 1,850 opt-in plaintiffs who had not been deposed).

> **B.    Gentiva's Written Discovery Requests and Subpoenas Pertaining to Credit Card Statements, Cash Receipts, and Tax Returns**[23]

On November 12, 2010, Gentiva served its First Set of Document Requests and its First Set of Interrogatories directed to Lisa Rindfleisch, Tiffany Melendez, Michelle Gentile, Laurie Baker, and Christina Nelmes (collectively, the "Discovery Requests").  (*See* Ex. T.)  On December 15, 2010, Plaintiffs served their individual responses and objections to Gentiva's Discovery Requests.  (*See* Ex. U.)  Despite good faith efforts to resolve any disputes without the assistance of the Court, the parties have been unable to reach agreement on three of Gentiva's document requests.  The disputed document requests are:

- **Document Request No. 5:** Any and all records or documentation during your employment with defendant, referring or related to charge, debit card, checking, or credit activity, including but not limited to all purchases, debits, cash advances, credits and/or payments, daily transaction history, cancelled checks, all billing statements, and itemization of all activity that detail both the dates and time of the same

---

[23] Defendant has not yet issued subpoenas for these records but intends to do so shortly.  Defendant requests that Plaintiffs be ordered to produce these documents and execute consents for the third party release of the same <u>before</u> depositions.

starting from the three (3) years preceding the filing of this Action (six (6) years preceding the filing of this Action for all plaintiffs who were employed by defendant in the State of New York) and ending on the last date of employment during which you claim to have worked for defendant.

- **Document Request No. 6:** Copies of any and all cash receipts which detail both the dates and times you completed purchases during your employment with defendant starting from three (3) years preceding the filing of this Action (six (6) years preceding the filing of this Action for all plaintiffs who were employed by defendant in the State of New York) and ending on the last date of employment during which you claim to have worked for defendant.

- **Document Request No. 7:**  Your federal and state income tax returns, with all attachments and schedules, for all calendar years starting from the three (3) years preceding the filing of this Action (six (6) years preceding the filing of this Action for all Plaintiffs who were employed by Defendant in the State of New York) and ending on the last date of employment during which you claim to have worked for Defendant.

- **Plaintiffs' Response to Document Request No. 5:** Objection.  Plaintiff objects on the grounds that this request is not reasonably calculated to lead to discoverable information and seeks information which is irrelevant, harassing, unduly intrusive, and is an improper attempt to obtain the class representatives' sensitive, personal financial information. Plaintiff objects to providing such documentation.  *See, Holman v. Burgess*, 404 S.E.2d 144 (Ga. App. 1991); *Krauter v. Norfolk Southern Railway Co.*, Case No. 3:03CV7231, 205 U.S. Dist. LEXIS 519, at *4-5 (D. Ohio 2005).

- **Plaintiffs' Response to Document Request No. 6:**  Objection.  Plaintiff objects on the grounds that this request is not reasonably calculated to lead to discoverable information and seeks information which is irrelevant, harassing, unduly intrusive, and is an improper attempt to obtain the class representatives' sensitive, personal financial information. Plaintiff objects to providing such documentation.  *Holman v. Burgess*, 404 S.E.2d 144 (Ga. App. 1991); *Krauter v. Norfolk southern Railway Co.*, Case No. 3:03CV7231, 205 U.S. Dist. LEXIS 519, at *4-5 (D. Ohio 2005).

- **Plaintiffs' Response to Document Request No. 7:** Objection. Plaintiff objects to this request on the grounds that this request is not reasonably calculated to lead to discoverable information and seeks information which is irrelevant, harassing, unduly intrusive and is an improper attempt to obtain the class representative's personal financial information. Plaintiffs also object on the grounds that income tax returns are generally protected from disclosure during discovery. *See, e.g., Smith v. Bader*, 83 F.R.D. 437, 438-39 (S.D.N.Y. 1979); *DeMasi v. Weiss*, 699 F.2d 114, 119-21 (3d Cir. 1982); *Houlihan v. Anderson-Stokes, Inc.*, 78 F.R.D. 232, 234 (D.D.C. 1978). Notwithstanding such objection, and even though Gentiva has documentation of Plaintiff's Gentiva earnings, plaintiff will produce documents in her possession, other than tax returns, which demonstrate the income earned form Gentiva during the time period covered by this case, or income earned from other employers for whom plaintiff worked contemporaneously with her employment by Gentiva.

1.   <u>Plaintiffs' Argument in Opposition to Defendant's Request for Plaintiffs' Personal Financial Information</u>

Plaintiffs object to Defendant's request for such personal financial information because it is not reasonably calculated to lead to discoverable information and seeks information which is irrelevant, harassing, and unduly intrusive. Plaintiffs further argue that Defendant is merely engaging in a fishing expedition of the class representatives' sensitive and personal financial information. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). "Determinations of relevance in discovery rulings are left to the sound discretion of the trial court and

will not be reversed absent an abuse of discretion." *Hayden v. Bracy*, 744 F.2d 1338, 1342 (8th Cir. 1984).

In *Barrington v. Mortgage, Inc.*, 2007 WL 4370647 (S.D. Fla. 2007), plaintiffs alleged defendant misclassified its employees as exempt under the FLSA. Defendant sought all records pertaining to plaintiffs' former employment. The records contained highly personal and confidential information, such as social security numbers, medical information, payroll information, income tax information, and financial information, and information about family members. The plaintiffs contended that the overly broad nature of the requests, for purpose of the…document requests appeared to be nothing more than a fishing expedition to harass plaintiffs…and a tactic to deter them and other potential plaintiffs from pursuing their claims in that case. *Id*. at 3. The court in *Barrington* found that the records of plaintiffs' former employers did not appear relevant to the claims or defenses of whether plaintiffs worked for defendant more than forty (40) hours a week without receiving overtime compensation, or whether defendant properly classified plaintiffs' positions as exempt from the FLSA overtime provisions.

Here, Defendant's insistence on obtaining financial records with highly personal information lacks relevance in demonstrating Defendant properly classified the clinicians as exempt from overtime. Specifically, the Court's decision on  determining whether the named and opt-in Plaintiffs are/were

45

similarly situated with respect to Defendant's misclassification of Clinicians as exempt should be made based on the PPV compensation practice: Whether Defendant's payments to Clinicians were made based on their time or number of hours worked and not on the accomplishment of a single task in contravention of the FLSA; whether clinicians were similarly situated with respect to this PPV plan; and whether clinicians worked more than forty (40) a week without receiving overtime compensation.

Ironically, 29 C.F.R. § 516.2 states that employers whose employees are subject to the both sections 6 and 7 (overtime provisions) of the FLSA must maintain a proper record of all hours worked to determine how much employees should be paid, including paying time and one half for hours worked in excess of 40. *Id*. Named Plaintiffs generally recall Defendant instructed them not to document their charting time at home because this activity was considered part of the patient visit and therefore not compensable. The named Plaintiffs' recollection of this policy would have been consistent with the FLSA recordkeeping provisions, assuming an employee had been correctly classified as exempt. (*See* 29 C.F.R. 516.2.)

Under these facts, however, it is uncontested that Defendant required its Clinicians to record certain hours worked for time spent with patients and non-patient related tasks. While Clinicians were compensated based on units, the units

46

attributed to certain tasks were commensurate with the time *spent on those activities*. (*See* Ex. E at L-RF001759 or p. 19.) In other words, the units attributed to certain tasks were commensurate with the *time* spent on those activities. *Id*. Otherwise, there would have been no reason for Defendant to require the recordation of such time. Defendant states: "Plaintiffs claim they failed to record much of this work time in contravention of Gentiva's policy." (*See infra* p. 38.) If this were, in fact, the case then while Defendant maintains Clinicians were correctly classified as exempt, what would have been its motivation for requiring that they record their hours worked for certain activities, if not to pay them for such hours in contravention of the fee basis requirements. (*See* Ex. E, F, and G.)

While Defendant raises minor discrepancies in Plaintiffs' time slips which again only confirms they were paid according to their time, it does not negate the overwhelming number of hours all Clinicians assert they spent charting after hours which Defendant arbitrarily chose not to pay them. (*See* Dkt. No. 57.) Now, Defendant wishes to obtain Plaintiffs information on "*all documents that would identify their whereabouts during the applicable period*" for what appears to be nothing more than a fishing expedition to harass the Plaintiffs, and to utilize such highly sensitive information by attempting to demonstrate Plaintiffs were

anywhere else but working.[24]  (*See* Exhibit H, A. Spinola's March 3, 2011 email correspondence to Plaintiffs' counsel.)  The reality is that such records will not prove valuable because they will not provide specific times or length of time when such activities took place.  In fact, Defendant's records would prove much more beneficial in that Defendant's records would actually demonstrate when Plaintiffs were <u>not</u> working because of its policy to report absences.

In addition, while a banking record may demonstrate where a Plaintiff was on a particular day, such banking records will not refute the number of hours Plaintiffs alleged they worked in a day or in a week because there are too many hours (in a day) when the after-hours' work could have taken place.  Therefore, Defendant's proposal of demonstrating one (1) hour, here or there, at a particular location will be meaningless in trying to refute the hours worked asserted by the Plaintiffs.[25]

---

[24] Indeed, in *Krauter*, 2005 U.S. Dist.LEXIS 519, at *1, where plaintiff claimed a physical injury made him unable to perform his usual activities, defendant sought financial records for the same purpose that Gentiva does here – claiming that the financial records would prove what activities the plaintiff engaged in (while here Gentiva seeks to prove not only what activities plaintiffs engaged in, but also their duration).  The court rejected that discovery request, noting that the plaintiff had been deposed and that "[p]rying into a plaintiff's private financial affairs should require more than the simple assertion that, in effect, the defendant wants to find out whether there is some inconsistency between what plaintiff and his doctors are telling it and what his bank statements and credit card receipts might show." That is the sole basis for Gentiva's request here, and should be denied.

[25] For example, Defendant asserts named Plaintiff Rindfleisch indicated she always

Similarly, Defendant's requests for Plaintiffs' tax returns are not justified under controlling law and are designed to intimidate and harass potential Plaintiffs rather than to discover relevant evidence.   There is a strong public policy of protecting the privacy and confidentiality of tax returns, and requests for production of tax returns are closely scrutinized. *See A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 191 (C.D. Cal. 2006); *Lemanik v. McKinley Allsopp, Inc.*, 125 F.R.D. 602 (S.D.N.Y. 1998); *see also Pendlebury*, 2005 U.S Dist. LEXIS 36748 at *5-6 (the court declined to compel production of tax returns because the information sought regarding other employment was readily available through interrogatories, depositions, or requests for admissions).   "In general, most courts have noted that public policy concerns favor keeping tax returns confidential when possible, and have ordered production *only* when the relevance of the information is clear and there is a compelling need."   *Camp v. Corr. Med. Servs.*, 2009 U.S. Dist. LEXIS 12034, *6 n.3 (M.D. Ala. Feb. 17, 2009) (quoting *Columbus Drywall & Indus., Inc. v. Masco Corp.*, 2006 U.S. Dist. LEXIS 97154, 2006 WL 5157686, *7 (N.D. Ga. 2006)).[26]

---

worked from 7:00 to 9:00 p.m., and Defendant's ability to obtain highly sensitive financial information would refute her asserted hours during that time.  However, Defendant took named Plaintiff's Rindfleisch's testimony out of context because what she said was that most of the time she worked from approximately 7:00 to 9:00 p.m.  (*See* Rindfleisch Dep. at 19:15-20:25, Ex. V.)

[26] Defendant also mischaracterizes *Maddow v. Proctor & Gamble, Co., Inc.*, 107

This standard of clear relevance and compelling need is certainly not met here.  Defendant seeks tax returns primarily in the speculative hope that the returns might impeach Plaintiffs' testimony that, other than Plaintiff Nelmes, they did not hold another job contemporaneously with their Gentiva employment.  (*See infra.* 53-54.)  Courts have been dismissive of such tenuous claims of relevance, particularly where a party seeks production of tax returns.  *See e.g.*, *Camp*, 2009 U.S. Dist. LEXIS 12034 at *7-8 (declaring the relevance of tax returns "tenuous at best" where "[Defendant] seeks Plaintiffs' income tax returns to test the truthfulness of the Plaintiffs' responses to its discovery requests and deposition questions but has no evidence suggesting that the Plaintiffs are not credible.")

Because Defendant's request for such highly personal and sensitive financial information has no merit or relevance to any claims or defenses in this case, Plaintiffs respectfully request that this Court deny Defendant's written discovery requests and subpoenas pertaining to the named Plaintiffs' banking information

---

F.3d 846 (11th Cir. 1997) in arguing that the Eleventh Circuit rejected a heightened standard for requiring production of tax returns.  As the Federal District Court for the Middle District of Alabama has explained, such an argument "read[s] too much into *Maddox*, which did not hold that relevance is the sole test for production of income tax records."  *Camp v. Corr. Med. Servs.*, 2009 U.S. Dist. LEXIS 12034, *8 n.3 (M.D. Ala. Feb. 17, 2009).  Rather, *Maddow*, did not address the standard applicable to production of tax records at all in holding summarily that the district court did not abuse its discretion in compelling production, and "[t]here is nothing in *Maddow* which suggests that the issue of compelling need was raised; it certainly was not decided."  *Camp*, 2009 U.S. Dist. LEXIS 12034 at *8 n.3.

and tax records.

2.   Defendant's Support for Compelling Responses to Discovery Requests Pertaining to Credit Card Statements, Cash Receipts, and Tax Returns

Plaintiffs' only objections to producing credit card statements, cash receipts, and related records are based on relevance and privacy.  As a preliminary matter, the Eleventh Circuit Court of Appeals and district courts in this Circuit have consistently held that there is no added protection associated with financial information based on privacy.  *See, e.g.*, *Maddow v. Proctor & Gamble Co.*, Inc., 107 F.3d 846, 853 (11th Cir. 1997) (rejecting application of heightened standard to request for production of personal financial records and holding mere relevance standard is appropriate standard to apply to decide motion to compel).  Rather, if the records are potentially relevant, they must be produced. "[F]ederal law does not require any demonstration beyond Rule 26 relevance to allow a party to obtain financial information ... through discovery." *See Callaway v. Papa John's USA*, Inc., 2010 U.S. Dist. LEXIS 113274, at **5-6 (S.D. Fla. Oct. 12, 2010) (citing *Maddow*, 107 F.3d at 853 ); *Bellosa v. Univ. Tile Restoration, Inc.*, No. 08-60054, 2008 U.S. Dist. LEXIS 49630, at *4 (S.D. Fla. June 30, 2008).  Instead, where a request seeks relevant information, the Eleventh Circuit addresses any privacy concerns "by subjecting it to a confidentiality order." *See Callaway*, 2010 U.S. Dist. LEXIS 113274, at **5-6 (granting motion to compel production of financial

51

information, including tax returns, in FLSA case where protective order is in place).  The parties have entered into a confidentiality order here that addresses any privacy concerns that Plaintiffs may have.

Neither of the cases that Plaintiffs cite in their objections to the production of credit card statements and cash receipts involve FLSA or state wage law violations, where Plaintiffs' daily activities and non-working time are directly relevant to Plaintiffs' claims and Defendant's defenses and there are limited ways to uncover the information.  *See Krauter*, 2005 U.S. Dist. LEXIS 519, at *1 (plaintiff's claims are for recovery for injuries making him unable to perform his usual activities); *Holman*, 404 S.E.2d at 144 (Ga. App. 1991) (plaintiff's claims are for damages related to unlawful trespass and destruction of property and discovery requests are related to support for punitive damages).  Likewise, the additional authority relied on by Plaintiffs here is out of context and equally unpersuasive. *See Barrington*, 2007 WL 4370647, at **3-4 (Court's reasoning for granting motion to quash third party subpoena is that a request for *all* records pertaining to plaintiffs' former employment is overbroad and seeks irrelevant information in FLSA case, and is unrelated to privacy concerns absent finding proper standing to bring motion to quash).

Similarly, the authority that Plaintiffs cite in support of their objection to the production of their federal and state income tax returns on the basis of privacy and

relevance is equally unpersuasive.  These cases apply a standard for determining whether to compel the production of financial information that the Eleventh Circuit Court of Appeals has declined to adopt.[27]  *See, e.g.*, *Erenstein v. SEC*, 316 Fed. Appx. 865, 869-870 (11th Cir. 2008) (in civil cases, we [being the 11th Circuit] have not required a showing of compelling need before tax information may be obtained by a party in discovery, but instead have determined that such information need be only arguably relevant); *Maddow v. Proctor & Gamble Co.*, Inc., 107 F.3d 846, 853  (11th Cir. 1997) (affirming order compelling discovery of tax returns over producing parties' objection that tax records were private as well as

---

[27] Out of the more than twenty Eleventh Circuit district court cases considering the Eleventh Circuit's ruling in *Maddow* and determining the production of tax documents, the *Camp* case is the *only* case that has decided not to follow *Maddow* and instead consider a heightened standard for such documents and, to date, no other courts have followed the *Camp* court's decision. *See e.g.*, *Walker v. Americare Radiographics, Inc.*, No. 10-60340-CIV-Moore/Simonton, 2010 U.S. Dist. LEXIS 139021, at *16 (S.D. Fla. Dec. 27, 2010) (finding tax records are relevant and must be produced in a FLSA case); *Callaway v. Papa John's USA, Inc.*, No. 09-61989-CIV-ZLOCH/Rosenblum, 2010 U.S. Dist. LEXIS 113274, at **5-6 (S.D. Fla. Oct. 12, 2010) ("In the Eleventh Circuit ... federal law does not require any demonstration beyond Rule 26(b) relevance to allow a party to obtain financial information, including tax records, through discovery. ... Rather, where a request seeks relevant information, the Eleventh Circuit address the private nature of financial information by subjecting it to a confidentiality order.").  Further, courts in the Northern District of Georgia have found that establishing relevancy alone is sufficient to justify the production of tax-related documents. *See Huff v. Huff*, No. 1:04-CV-0172-GGB, 2006 U.S. Dist. LEXIS 57090, at *6 (N.D. Ga. Aug. 15, 2006) (ordering production of tax returns based on relevancy); *MCI Worldcom Network Servs. v. Von Behren Elec., Inc.*, No. 1:00-CV-3311-JTC, 2002 U.S. Dist. LEXIS 28331, at **9-10 (N.D. Ga. May 17, 2002)("The question of discoverability of tax records turns on relevance.").

cumulative of documents already produced).   Even more, none of the cases Plaintiffs refer to hold that tax returns should not be produced through discovery solely based on privacy reasons.  *See Camp*, 2009 U.S. Dist. LEXIS 12034 at *8 (plaintiffs had already produced arguably relevant tax returns and remaining requests were not for relevant or unobtainable information); *DeMasi*, 699 F.2d at 119-21 (no final determination regarding disclosure of salary information because petition for writ of mandamus was denied); *Smith*, 83 F.R.D. at 438 (granting motion to compel production of tax returns and acknowledging that privacy concerns are addressed through stipulated confidentiality order protecting against public disclosure); *Houlihan*, 78 F.R.D. at 234 (granting motion to compel production of tax returns where it is not the amount of income that is really sought from tax returns but other information related to defendants' defenses to claims). In fact, the *Smith* and *Houlihan* cases actually support <u>Defendant's</u> request to compel the production of tax returns for purposes of determining whether additional income was earned from other sources, among other things.

Having no basis to assert an independent privacy concern, Plaintiffs' only remaining objection is relevance.  The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).  The term "relevant" must be "construed broadly to encompass any matter that bears on, or

that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Under this standard, Plaintiffs' tax returns and the records of Plaintiffs' credit card, debit card, checking and/or credit activity and cash receipts detailing when purchases were made during Plaintiffs' employment with Gentiva contain information that is directly relevant to Plaintiffs' claims that they were not paid all of the regular and overtime compensation to which they were entitled under the FLSA and state law.

Specifically, Plaintiffs contend that they (and other Clinicians) were not paid regular and overtime compensation for all hours allegedly worked, including work done between patient visits, in the evenings and on weekends.  (Dkt. No. 1, ¶¶ 28-30 (Rindfleisch), 38-40 (Melendez), 48-50 (Gentile), 58-60 (Baker), and 69-71 (Nelmes).)  Plaintiffs claim that that they failed to record much of this work time in contravention of Gentiva's policies.[28]  (*See* Baker Dep. at 130:20-131:2 and 131:19-22; Melendez Dep. at 172:8-13, excerpts from the named Plaintiffs'

---

[28]  It is unclear why Plaintiffs include a discussion in this discovery brief speculating as to Gentiva's purpose in maintaining a policy requiring Clinicians to record all time worked.  (*See supra* pp. 46-47.)  To allay Plaintiffs' curiosity, there are many reasons why an employer would want all employees to maintain comprehensive timekeeping records, including, but limited to, for employee relations purposes (to understand its employees' workloads and performance), for business purposes, and for employee benefits qualification.  As noted above, the Home Health industry also requires proper tracking of working time, as do the regulations regarding "fee" basis compensation.

deposition transcripts collectively are attached hereto, in the order referenced, as Ex. W.)  Plaintiffs claim that they were working so much that they rarely ate lunch and had no down time between visits.  Defendant and many of Plaintiffs' co-workers maintain that Plaintiffs were not spending time between visits working but rather eating out at lunch, shopping, tending to their children, and performing other non-work related tasks.  Therefore, credit card statements and cash receipts from the same period of time Plaintiffs seek damages are clearly relevant.  *See Bellosa*, 2008 U.S. Dist. LEXIS 49630, at \*\*12, 15 (holding, in FLSA case for overtime, that tax-related documents would be relevant to show plaintiffs were not working the time they allege).

Plaintiffs' argument that "banking records will not refute the number of hours Plaintiffs alleged they worked in a day or in a week because there are too many hours (in a day) when the after-hours' work could have taken place" is not persuasive.  Plaintiffs claim to have worked during the same specific window of time each day.  For example, Plaintiff Rindfleisch claims that she worked every night from 7 p.m. through 9 p.m.  (*See* Rindfleisch Dep. at 19:25-20:6, excerpt attached as Ex. X.)  Her credit card activity may refute that claim.  Further, Plaintiffs completed time sheets that specify the exact times that they claim to have worked.  (*See* Nelmes Dep. at 80:20-81:5, 106:8-107:8, 108:3-10; Baker Dep. at 31:3-23, excerpts attached as Ex. Y.)  Plaintiffs' depositions have revealed several

56

occasions where they submitted time records claiming to be in multiple places at one time, which Plaintiffs concede would be impossible.   For example, on December 23, 2008, Plaintiff Rindfleisch recorded on her visit sheet that she was traveling to a patient's house from 3:20 p.m. to 3:30 p.m. and was with the patient from 3:30 p.m. to 4 p.m. On her employee time slip for that same day, she also reported being in the office from 3 p.m. to 4 p.m.   She acknowledged this discrepancy and admitted she could not have been in both places at once. (*See* Rindfleisch Dep. at 250:7-251:20, excerpt attached as Ex. Z.)   Similarly, on February 17, 2009, Plaintiff Gentile recorded that she was traveling between patient visits from 9:40 a.m. to 10 a.m.   On her employee time slip for that same day, she also reported non-client time from 9 a.m. to 10 a.m. (*See* Gentile Dep. at 259:14-261:12, excerpt attached as Ex. AA.)   Plaintiff Gentile acknowledged that she could not have been in both places and that she was overpaid to the extent she was paid for both the overlapping visit time and the office time.   *Id.*   Plaintiffs' credit card statements and receipts may reveal similar inconsistencies.   Similarly, if the records show that Plaintiffs made a purchase or transacted business at a bank located miles from their designated job sites for the day, or at a time that conflicts with time recorded on their visits sheets, the requested information would refute Plaintiffs' claims that they worked for the entire period for which they claim they were improperly compensated.   Also, Plaintiffs' tax returns may reveal that

Plaintiffs worked for other employers contemporaneously with their employment with Gentiva and may lead to information refuting Plaintiffs' claims.[29]

Gentiva's requests have three purposes: (1) to elicit information which tends to support Gentiva's position that, whether exempt or non-exempt, Plaintiffs, in fact, were paid for all hours worked and are not entitled to all of the overtime compensation they seek; (2) to refresh Plaintiffs' recollections of their activities during the workday;[30] and (3) to challenge the veracity of Plaintiffs' claims that they worked all of the hours they claim during the workday, in the evenings and on weekends.[31] The discovery requests are designed to lead to information that will expose personal activities in which Plaintiffs engaged during the same time they claim to have worked regular and overtime hours for Gentiva. Accordingly, records of Plaintiffs' credit card, debit card, checking and/or credit activity and cash receipts detailing when purchases were made during Plaintiffs' employment

---

[29] At least one named Plaintiff, Nelmes, held another job contemporaneously with her employment with Gentiva. (*See* Nelmes Dep. at 68:2-23, excerpt attached as Ex. BB.)

[30] For example, Plaintiff Baker testified that she "probably" used credit cards to make purchases during her employment with Gentiva, but she could not remember "exactly when." (*See* Baker Dep. at 117:2-18, excerpt attached as Ex. CC.)

[31] Defendant is unclear why Plaintiffs referenced part of an email sent to Plaintiffs' counsel concerning Plaintiffs' preservation efforts. In any event, the partial citation of the email is misleading as the email was merely attempting to confirm that Plaintiffs' counsel had taken steps to preserve the documents at issue here. Indeed, the email references the same types of documents listed in these document requests.

and Plaintiffs' tax returns evidencing that Plaintiffs worked at or ran other business while employed by Gentiva are relevant to this inquiry. *See Bellosa*, 2008 U.S. Dist. LEXIS 49630, at **12, 15 (granting motion to compel plaintiffs in FLSA case for overtime to produce phone records, bank records, credit card and debit card records and receipts, banking receipts and statements, cash receipts, and tax-related documents where records would be relevant to show plaintiffs were not working at time they claimed they were); *see also Angelin v. Maxim Healthcare Servs., Inc.*, No. 6:08-cv-Orl-22DAB, 2009 U.S. Distr. LEXIS 34562, at **4-5 (M.D. Fla. Apr. 3, 2009) (evidence of activities outside of work for defendant is "reasonably calculated to lead to the discovery of admissible evidence concerning Plaintiff's credibility as to the hours worked for Defendant")

For all of these reasons, Plaintiffs should produce the documents requested in Gentiva's Document Requests Nos. 5 and 6.[32]

## C.   Gentiva's Written Discovery Requests and Subpoenas Pertaining to the School Records of Plaintiffs' Children

The same day that Gentiva served Plaintiffs with its first set of Discovery Requests, counsel for Gentiva sent email correspondence to Plaintiffs' counsel informing Plaintiffs of Gentiva's intent to serve the third-party subpoena requests

---

[32] Defendant also intends to serve subpoena requests for similar documents and requests that the Court address the relevancy of these documents in this context as well to avoid a dispute concerning subpoenas.

for documents, including subpoenas for records from the schools Plaintiffs' children attend, and thus providing an opportunity for Plaintiffs to suggest edits to the requests in an effort to come to an agreement on the issue. The parties exchanged email correspondence further discussing Gentiva's intended third-party subpoenas. (*See* Nov. 12, 2010 email correspondence between Plaintiffs' counsel and Gentiva's counsel, attached as Ex. DD.) Plaintiffs altogether oppose Gentiva's subpoena for records from Plaintiffs' children's school records.

Later that day, Gentiva served the subpoenas on the Auburn Enlarged City School District, in Auburn New York, where Gentiva had information that the children of Plaintiffs Rindfleisch and Melendez attended during Plaintiffs' employment with Gentiva. (*See* Subpoenas to Auburn Enlarged City School District, attached as Exhibit EE.) The subpoena requests were limited to "documents that reflect activities or events personally attended by [Plaintiff]," and limited the information sought to "the date, time and duration of these activities and events rather than the substance of the communications." (*See id.* at Exhibit(s) A.) After the subpoenas were issued, the parties again discussed and exchanged written documentation on how to proceed regarding the third-party subpoenas given Plaintiffs' concerns regarding the disclosure of confidential information relating to their minor school children.

Plaintiffs objected to Defendant's document request:

- **Document Request No. 11:**  Any and all documents and/or files starting from the three (3) years preceding the filing of this Action (six(6) years preceding the filing of this Action for all plaintiffs who were employed by defendant in the State of New York) and ending on the last date of employment during which you claim to have worked for defendant, pertaining to your children's school attendance and school disciplinary issues, including attendance records, records of parent/teacher conferences, notes or other documents excusing your children's absence or tardiness form school, and any other documents pertaining to your children's attendance or plaintiff's participation or attendance at school meetings or other school activities.  You only need to produce documents reflecting activities or events you personally attended.  Further defendant is only seeking the date, time and duration of these activities and events rather than the substance of the communications. As such, any sensitive information not pertaining to date, time and duration may be redacted.

- **Plaintiffs' Response to Document Request No. 11:**  Plaintiff objects on the grounds that this demand is not reasonably calculated to lead to discoverable information and seeks information which is irrelevant, unduly intrusive, and appears to be designed to facilitate further subpoenas to third parties seeking documents protected by the Family Educational Rights and Privacy Act, 20 U.S.C.A. § 1232g.  Plaintiffs object to providing this information.

Plaintiffs' counsel emailed Defendant's counsel following their discussion about Defendant's subpoenas for the school records of Plaintiffs' minor children. Defendant understood the parties to have reached the following agreement (Apparently, Plaintiffs did not have the same understanding as Defendant): Defendant's counsel would not review the documents sent by the school in response to the subpoena.  Rather, Defendant would immediately forward the unopened envelopes to Plaintiffs' counsel for review and redaction of any sensitive information.  (*See* Nov. 15, 2010 email correspondence from F. Horne to A.

61

Spinola, attached as Ex. FF.)  Defendant's counsel understood Plaintiffs' counsel would then return the redacted documents to Defendant.  Plaintiffs' counsel understood that the minor children's school records would be sent by Defendant's counsel to Plaintiffs' counsel to avoid a Motion for Protective Order and emergency hearing during the holiday season and further to allow Plaintiffs' counsel time to discuss with their clients whether or not the school records were relevant and whether the Plaintiffs, and their current or former spouses would consent to the release of the minor children's school records.  Until now, no Plaintiff consents to the release of their minor children's school records.

Gentiva's counsel received what appeared to be the school district's responses to Gentiva's subpoenas, and in compliance with the parties' agreement, did not open the packages and immediately mailed them to Plaintiffs' counsel. (*See* Nov. 30, 2010 correspondence from V. Flam to F. Horne, forwarding packages from the school district, attached as Ex. GG.)  To date, Plaintiffs have not returned any of the documents to Gentiva. While the parties have not resolved the issue relating to Plaintiffs' minor children's school records, and the parties have been working to file a consolidated pleading to address these discovery disputes pursuant to the Court's January 24, 2011 Order, Defendant re-sent the November 12, 2010 subpoenas to the Plaintiffs' children's schools.  Defendant has requested second copies of such disputed records, requiring that the schools respond by April

8, 2011.  On April 8, 2011, Plaintiffs filed a Motion for Protective Order and a Motion to Quash the subpoenas.

1.   Plaintiffs' Argument in Opposition to the Subpoena for Plaintiffs' Children's School Records

As maintained by Plaintiffs' response to document request number 11, Plaintiffs object to the production of Plaintiffs' children's school records on the grounds that this demand is not reasonably calculated to lead to discoverable information, seeking information which is irrelevant, unduly intrusive, and disclosure of such documents violates the Family Educational Rights & Privacy Act ("FERPA").  The purpose of FERPA is to assure parents of students' access to their education records and to protect such individuals' rights to privacy by limiting the transferability and disclosure of their records without their consent. Family Education Rights & Privacy Act of 1974, 513(b)(2), 20 U.S.C.A. § 1232(g)(b)(2).

In fact, privacy violations that result from any disclosure of education records protected under FERPA are no less objectionable simply because release of the records is obtained pursuant to judicial approval unless, before approval is given, the parties seeking disclosure is required to demonstrate a genuine need for the information that outweighs the privacy interests of the students.  *See* FERPA, 513(b)(2)(b), 20 U.S.C.A. § 1232(g)(b)(2)(B).   Specifically, a party seeking

disclosure of education records protected by FERPA bears a "significantly heavier burden" to justify disclosure than exists with respect to discovery of other kinds of information, such as business records.  *Id*.  "Determinations of relevance in discovery rulings are left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion."  *Hayden v. Bracy*, 744 F.2d 1338, 1342 (8th Cir. 1984).

In *Ragusa v. Malverne Union Free School District*, 549 F. Supp. 2d 288 (E.D.N.Y. Feb. 19, 2008), plaintiff alleged discrimination against a school based upon the plaintiff's disability, age, and national origin which resulted in defendant's decision to deny plaintiff's tenure.  In *Ragusa*, the court acknowledged that both within and outside of the circuit, the courts had demonstrated a willingness to allow the disclosure of protected education records when the moving party had met its "significantly heavier burden" to show that its interests in obtaining the records outweighed the student's privacy interests.  *Id*. at 292; *see also Nastasia v. New Fairfield Sch. Dist.*, No. 3:04-CV-925 (TPS, 2006) WL 1699599, *1-2 (D. Conn. June 19, 2006).  The court in *Ragusa* had found that while the information sought by plaintiff's counsel was protected by FERPA, the records sought by plaintiff were relevant on the issue of pretext, and her need for these records sufficiently outweighed the students' privacy interests.

In this case, however, Defendant has not met its "significantly heavier

64

burden" to show that its interests in obtaining such records outweigh Plaintiffs' children's privacy interests.   Again, such highly sensitive information has absolutely no relevance in demonstrating whether Defendant's payments to clinicians were made based on the number of hours worked and not on the accomplishment of a single given task in contravention of the FLSA; whether clinicians were similarly situated with respect to this PPV plan; whether clinicians worked more than forty (40) a week without receiving overtime compensation as required by the FLSA overtime provisions.

Specifically, Defendant will argue that Plaintiffs' children's school records will bear dates and signatures of Plaintiffs who attended parent/teacher meetings and school functions, and this will contradict their asserted hours worked; however, these records will not demonstrate the <u>length</u> of time spent engaged in these school activities.[33]   As previously stated, there are too many hours in a day when Plaintiffs could have been engaged in required work activities to suggest their uncompensated work time did not exist.

More importantly, named Plaintiffs do not consent to the production of such

---

[33] While Defendant attempts to challenge Plaintiffs' veracity regarding their involvement with their children's school functions and meetings by stating "Plaintiffs consistently missed work due to school functions and issues." (*See infra* p. 51.)   This, in fact, demonstrates Defendant has records which would show Plaintiffs' recorded absences.   Therefore, this proves Defendant's records regarding Clinicians' absences is much more valuable than Plaintiffs' children's school records..

highly sensitive information. Even though Defendant proposes the redaction of language relating to a minor child's performance, behavior, or other personal issues at school, the redaction of such language for *potentially* viable information does not justify the substantial burden imposed upon Plaintiffs or their privacy concerns.[34] Accordingly, Defendant has failed to meet its significantly higher burden in obtaining named Plaintiffs' personal children's school records and its relevancy to the issues in this case. Based on the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's request for the production of Plaintiffs' children's school records as it violates their privacy interests under FERPA.

  2. <u>Defendant's Argument in Support of its Requests and Subpoenas Pertaining to the School Records of Plaintiffs' Children</u>

 Similar to their objections concerning certain financial records, Plaintiffs' only objections to producing school records are based on relevance and privacy. As detailed above, the privacy objection is entirely meritless. Defendant has repeatedly explained it has no interest in any information related to Plaintiffs' children. Rather, the records Defendant seeks relate solely to the times and dates

---

[34] Furthermore, Plaintiffs have recently filed a Motion for Protective Order with attachments of the named Plaintiffs' minor children's school records, and respectfully request that the Court conduct an *in camera review* to determine that Defendant's basis for obtaining such highly personal information has no merit.

two of the Plaintiffs were present at a school function, meeting or event during working hours.  To alleviate any privacy concerns, Defendant requested that the schools redact any sensitive information from any subpoena responses before serving the same.  When Plaintiffs argued that the schools might miss some sensitive information that Defendant could then see, Defendant actually agreed to allow Plaintiffs' counsel to preview the subpoena responses before Defendant reviewed them and redact any sensitive information themselves.  The only information not to be redacted was information related to the date, time and duration Plaintiffs attended a school activity, which reveals nothing about the activity itself or the Plaintiffs' children.  Clearly, such a procedure alleviates any possible concern over privacy.  The case cited by Plaintiffs, where the court permitted the production of school records, establishes the same.  *See Ragusa*, 549 F. Supp. 2d at 294 (finding "privacy concerns are tempered when the request records are produced in redacted form and subject to a protective order."). Plaintiffs' counsel have not even attempted to explain how they could possibly maintain a privacy objection given Defendant's agreement to allow them to preview and redact any sensitive information, which again, is not the target of the subpoena.  In any event, given these facts and Defendant's extreme efforts to alleviate any legitimate privacy concern, any continued assertion of a privacy objection does not pass the red face test.

Plaintiffs' objections to Gentiva's discovery request based on the Family Educational Right and Privacy Act ("FERPA"), 20 U.S.C. S. §1232g, are equally baseless. First, Plaintiffs' counsel have no standing to claim a FERPA violation. FERPA applies to an educational agency or institution and conditions the entities' receipt of federal funds, in part, on those entities' procedures for the provision of minor children's school records. It is the institution itself, and not Plaintiffs' counsel, that will determine what legal obligations it has under FERPA.

Second, even if Plaintiffs' counsel had standing to assert a FERPA claim, obtaining or requesting school records of minor children of whom you are not the parent from such an educational agency or institution is not a violation of FERPA. *See Bauer v. Kincaid*, 759 F. Supp. 575, 589 (W.D. Mo. 1991) ("FERPA is not a law which prohibits disclosure of educational records."); *Red & Black Pub. Co., Inc., v. Bd. Of Regents*, 262 Ga. 848, 851 (1993) ("[FERPA] does not prohibit the disclosure of records."). Even more, courts have held that records that are not "relat[ed] to individual student academic performance, financial aid, or scholastic performance," are not the type of "education records" that FERPA is intended to protect. *Id.* Here, Gentiva is not seeking information related to the students' academic performance, or any other potentially sensitive information, and even requests that such information be redacted prior to production. Rather, Gentiva is only seeking information related to Plaintiffs' schedules and daily activities.

68

Finally, the FERPA statute itself creates an exception to allow such entities to release or provide access to student records "pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such ... subpoenas in advance of the compliance therewith by the educational institution or agency," which was the case here.  20 U.S.C. S. §1232g(b)(2)(B).  Thus, Plaintiffs' allegation that Gentiva's request is a violation of FERPA is a misinterpretation of the statute that should not be considered in determining whether discovery of these records is appropriate.[35]

The only even potentially legitimate argument Plaintiffs can make concerning these records is based on relevance.  Like the other time stamped records at issue, records and documents of Plaintiffs' attendance at meetings, activities and events at their children's schools should be produced because they similarly contain information that is directly relevant to Plaintiffs' claims that they were not paid all of the regular and overtime compensation to which they were entitled under the FLSA and New York and North Carolina state laws.  Indeed, Gentiva's purpose for this document request is the same as its above-expressed

---

[35] Further, Plaintiffs' reference to sections of FERPA as stating the standard for the burden that a party seeking FERPA-related records must bear is misleading, as this standard is not expressed in the statute itself.  Rather, the standard to which Plaintiffs refer was applied in the Eighth Circuit case that Plaintiffs later cite in which the Court determined that the party seeking the records had satisfied such burden for purposes of disclosure.  *See Ragusa*, 549 F. Supp. 2d at 288.

purpose for Document Requests Nos. 5 and 6 in that Gentiva seeks to elicit information which tends to support Gentiva's position that Plaintiffs were properly paid for all hours worked, to refresh Plaintiffs' memory, and to challenge the veracity of Plaintiffs' claims that they worked all of the hours they claim. Importantly, certain Plaintiffs have claimed that they had very little involvement in their children's school activities whereas their managers have told Defendant that these same Plaintiffs were consistently missing work as a result of school activities and issues.[36]   Therefore, the records are also highly relevant to certain Plaintiffs' credibility.  Accordingly, such records are relevant to the discovery of admissible evidence as they directly pertain to Plaintiffs' claims and Gentiva's defenses in this action.  *See e.g., Angelin*, 2009 U.S. Distr. LEXIS 34562, at **4-5; *Bellosa*, 2008 U.S. Dist. LEXIS 49630, at *78.

In addition to ordering Plaintiffs to produce documents in response to Document Request No. 11, Gentiva asks that the Court order Plaintiffs to return the

---

[36] Defendant is in the process of obtaining statements from several of these managers.  Unless Plaintiffs are willing to concede that their managers are telling the truth and they are not, Plaintiffs' footnote suggesting this information is within their possession makes little sense.  The records are an objective means by which to determine veracity.  Further, Plaintiffs suggestion that Defendant's records would indicate when Plaintiffs missed work for personal matters based on company policy requiring notification of the same is without merit.  Plaintiffs' counsel incorrectly assumes Plaintiffs actually followed Gentiva's policies, an assumption belied by the fact that certain Plaintiffs failed to report all working time in compliance with Defendant's policies.

subpoena responses received from the Auburn, New York school system to Gentiva.[37]   Gentiva forwarded the documents to Plaintiffs to address Plaintiffs' counsel's concerns that sensitive information related to Plaintiffs' children would be revealed to Gentiva's counsel.   As Gentiva was only interested in documents showing the dates and times that Plaintiffs were involved in school functions, Gentiva agreed to provide the documents to Plaintiffs' counsel before reviewing them, as a courtesy, so that Plaintiffs could have an opportunity to redact any other information.[38]   Gentiva did not agree that Plaintiffs could indefinitely retain and withhold the return of the documents, which were produced to Gentiva in response to a legally-issued subpoena.   Given that Defendant is not seeking *any* records or information related to minor children but only the information on these records related to their adult parents, Plaintiffs' FERPA argument is a red herring.   There is simply no justifiable reason to suggest that these records are irrelevant or protected by FERPA.   Plaintiffs should produce those documents to Gentiva's counsel to avoid further delaying the discovery process.

---

[37] A contemporaneous motion is currently pending with respect to these records.

[38] Courts have held that privacy concerns with the production of student records may be addressed by redacting "personally identifiable information" and/or having a protective order in place covering such documents.   *See e.g, Ragusa*, 549 F. Supp. 2d at 288 (granting motion to compel student records, if appropriately redacted).

## II.     CONCLUSION

Based on the foregoing discussion of the ongoing discovery issues in this litigation, as Plaintiffs and Defendant have been unable to resolve these disputes on their own through the meet and confer process, the parties respectfully and jointly request that the Court schedule a hearing to provide guidance to the parties on these discovery disputes.

Respectfully submitted this 27th day of April, 2011.


s/ Samuel L. Starks

Samuel L. Starks
Georgia Bar No. 676515
MARTIN & JONES PLLC
Atlanta Financial Center
3353 Peachtree Rd., NE, Suite 510
Atlanta, GA 30326
sls@m-j.com

H. Forest Horne, Jr., NCSB #16678
Gilda A. Hernandez , NCSB # 36812
MARTIN & JONES PLLC
410 Glenwood Avenue, Suite 200
Raleigh, NC 27603
Tel: 919.821.0005
hfh@m-j.com
gah@m-j.com

Christine E. Webber
COHEN MILSTEIN SELLERS &
TOLL, PLLC
1100 New York Ave., NW
Suite 500
Washington, DC 20005
Tel: 202.408.4600
cwebber@cohenmilestein.com


**ATTORNEYS FOR PLAINTIFFS**

s/ Angelo Spinola

Angelo Spinola
Georgia Bar No. 672191
aspinola@littler.com
Lisa A. Schreter
Georgia Bar No. 629852
lschreter@littler.com
SoRelle B. Brown
Georgia Bar No. 152450
sbbrown@littler.com


LITTLER MENDELSON
A Professional Corporation
3344 Peachtree Road N.E.
Suite 1500
Atlanta, GA  30326.4803
Tel: 404.233.0330
Fax: 404.233.2361

A. Michael Weber
New York Bar No. 1024181
mweber@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY  10022
Tel: 212.583.9600
Fax: 212.832.2719


**ATTORNEYS FOR DEFENDANT**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LISA RINDFLEISCH, TIFFANY MELENDEZ, MICHELLE GENTILE, LAURIE BAKER and CHRISTINA NELMES, on behalf of themselves and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>GENTIVA HEALTH SERVICES, INC.,<br><br>        Defendant. | CIVIL ACTION NO. 1:10-CV-03288-SCJ |

## **FONT CERTIFICATION**

The undersigned hereby certifies that this pleading complies with the font requirements of LR 5.1B because the document has been prepared in Times New Roman, 14 point.


s/ Samuel L. Sparks _____    s/ Angelo Spinola _____
Samuel L. Sparks                     Angelo Spinola
Georgia Bar No. 676515          Georgia Bar No. 672191
Attorney for Plaintiffs             Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LISA RINDFLEISCH, TIFFANY MELENDEZ, MICHELLE GENTILE, LAURIE BAKER and CHRISTINA NELMES, on behalf of themselves and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>GENTIVA HEALTH SERVICES, INC.,<br><br>        Defendant. | CIVIL ACTION NO. 1:10-CV-03288-SCJ |

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following:

Samuel L. Starks
Martin & Jones PLLC
Atlanta Financial Center
3353 Peachtree Rd., NE, Suite 510
Atlanta, GA 30326

H. Forest Horne, Jr.
Gilda A. Hernandez
Martin & Jones PLLC
410 Glenwood Avenue, Suite 200
Raleigh, NC 27603

Christine E. Webber
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave., NW, Suite 500
Washington, DC 20005

                        s/ Angelo Spinola
                        Angelo Spinola